COMMONWEALTH *vs.* JOSEPH A. MESSERE.

Norfolk. May 13, 1982. — June 10, 1982.

Present: ARMSTRONG, ROSE, & GREANEY, JJ.

*Constitutional Law,* Admissions and confessions, Waiver of constitu-
tional rights, Assistance of counsel. *Evidence,* Admissions and con-
fessions. *Waiver. Homicide. Self-Defense. Practice, Criminal,*
Assistance of counsel.

Where a defendant, while in police custody, had been given Miranda
warnings and asked on several occasions whether he desired an at-
torney and had declined the assistance of counsel on each occasion,
and where he later gave a lengthy and detailed account of his where-
abouts in narrative form, at the completion of which he was asked
whether he had "anything else to say," to which he responded, "No,"
the defendant's response did not, in the circumstances, constitute an
assertion of his right to remain silent, and the judge properly denied
his motion to suppress subsequent statements made to the police. [8-9]
A judge's instructions on self-defense, although employing the use of the
word "find," were sufficient where the judge specifically instructed, in
unequivocal language on three occasions, that the Commonwealth
had to establish the absence of self-defense by proof beyond a
reasonable doubt. [9-10]
A claim of ineffectiveness of counsel for the defendant in a criminal case
was not supported by the facts that counsel failed to interview a wit-
ness and disclosed her identity, with the result that the prosecution
called the witness to testify to the defendant's having solicited her to
commit perjury, where the damaging testimony which emerged was

caused by the defendant's own misconduct and by his representation to his attorney that the witness could provide testimony favorable to his case. [10-11]

INDICTMENT found and returned in the Superior Court Department on October 28, 1980.

The case was tried before *Donahue, J.*

*Maureen B. Brodoff* (*Robert Sheketoff* with her) for the defendant.

*Charles J. Hely,* Assistant District Attorney (*Gerald C. Pudolsky,* Assistant District Attorney, with him) for the Commonwealth.

GREANEY, J. About 4:00 A.M. on October 4, 1980, the victim was found in his automobile in a secluded area in Canton dying of multiple stab wounds. Twelve days later the defendant was arrested on a warrant for the homicide and subsequently indicted for murder in the first degree. The evidence warranted the jury in finding the following. Prior to the homicide both the defendant and the victim had been seen at a club in Randolph. Shortly before the victim was found by the police, the defendant went to the home of a friend, Ronald Cerasulo, where he attempted to clean a blood stain from his pants. Cerasulo observed the defendant to be "drunken, unshaven [and] nervous." There he told Cerasulo that "he had stabbed a guy down the street and thought he might have killed him," after "[t]he guy had reached under [his automobile] seat for a gun." The defendant told Cerasulo that, after the incident, his girlfriend had "screwed across the highway," and he asked whether he "[s]hould throw [his knife] in the pond on his way home." Prior to trial the defendant told Cerasulo to talk to his attorney to "set up a defense of self-defense for him." Still later the defendant asked a second friend, Doris Souris, "to go to court . . . and say that [she] was [with him] at the time of the crime . . . [,] that a fight started and a knife was pulled on him," after which she "was . . . supposed to have run across the highway." The defendant offered to pay Souris $1,000 for this false testimony. The defendant also

made several incriminating statements to the police follow-
ing his arrest which will be discussed in detail later in this
opinion. These statements were introduced at trial, to-
gether with other evidence which tended to establish the de-
fendant's guilt.[1] The jury convicted the defendant of
murder in the second degree. Represented by new counsel
on this appeal, the defendant argues that the judge erred in
denying his motion to suppress three statements made to the
police and in instructing the jury on the law of self-defense.
He also contends that his trial counsel's disclosure of the
identity of the witness Souris to the prosecution deprived
him of effective assistance of counsel. We find no error and
affirm the conviction.

1. The evidence at the voir dire held on the defendant's
motion to suppress was uncontradicted and may be sum-
marized as follows. The defendant was arrested on a war-
rant shortly after 2:00 A.M. on October 16, 1980, at his
apartment in Gardner by a contingent of State and local
police officers. Immediately upon arrest, and before leav-
ing the apartment, a State police officer gave the defendant
complete Miranda warnings which included advice about
his right to retain counsel and to have counsel at public ex-
pense. The defendant told the officer that he understood
his rights. He did not request counsel. A few minutes later
Canton police Sergeant John Ruane furnished the defendant
with a second set of Miranda warnings while he stood on the
porch or front walk of his apartment. The defendant again
acknowledged understanding of his rights and did not re-
quest a lawyer. While en route from Gardner to the Canton
police station, Trooper Robert Murphy of the State police,
the officer in charge of the investigation, furnished the

---

[1] The jury could have found that the defendant had removed pieces of
bloodstained upholstery from the passenger seat of his automobile; that
examination of another piece of upholstery taken from the defendant's
vehicle indicated a probable match between the victim's blood and the
blood found in that automobile; that the victim was short and slightly
built and had never been known to carry a weapon; and that information
contained in the statements made by the defendant to the police was false.

defendant with a third set of Miranda warnings. The defendant did not request an attorney. No questioning occurred during this lengthy trip.

Upon arriving at the police station around 3:45 A.M., the defendant was booked and given Miranda warnings by Sergeant Ruane for a fourth time. The defendant advised Ruane that he did not wish to call an attorney or otherwise make use of the telephone. No questioning took place during the booking procedure.

The defendant was next taken to an interview room, where Trooper Murphy advised him of the nature of the charge and furnished Miranda warnings for the fifth time. At that juncture, the defendant indicated that he wished to make a statement. He then provided Trooper Murphy with a lengthy account of his movements on the night of October 3 and the morning of October 4, in which he denied seeing the victim at anytime.[2] At the completion of the statement, the defendant was asked by the officer whether he had "anything else to say," and he responded, "No." The defendant expressed no desire to speak with counsel at anytime during or after the statement.

Sergeant Ruane, who had been in and out of the interview room while the defendant talked to Murphy, then took the defendant to his holding cell, where the conversation reported in the testimony set out in the margin took place.[3]

---

[2] In this statement, the defendant claimed that he had been drinking with his brother on the afternoon and evening of October 3, that they stopped at their cousin's house in Randolph, and that the two men eventually drove to Stoughton. In Stoughton, there was an argument with a relative of their cousin which resulted in an individual's being taken to a hospital. The defendant and his brother then visited a bar in Randolph and a café in Brockton. Sometime after midnight the defendant "lost" his brother and drove to a friend's house in Bridgewater. Finding no one home, he returned to Randolph and stopped at a Dunkin' Donuts restaurant. The defendant then stated that he had returned to his cousin's home, where he parked his automobile in the backyard. There he slept in the vehicle until later in the morning of October 4.

[3] PROSECUTOR: "Please tell the Court what transpired when you brought Mr. Messere to the cell or holding area?"

As to this conversation, Sergeant Ruane testified that he did not expect the defendant to respond to his comment about "telling the truth" because "I had told him to get hold of his attorney — I said 'Sit down with your attorney and get hold of us and we will all sit down and talk about it.'"

Trooper Murphy was immediately called to the cell, where he asked the defendant whether "he wished to speak with me again?" The defendant replied, "Yes, I do." He was taken to the interview room and furnished Miranda warnings by Murphy for the sixth time. The defendant acknowledged his understanding of the warnings, made no request for a lawyer, and stated: "I want to tell you what happened. If you have my prints, I went down the road and saw the car." The defendant then stated that he had found the victim in his vehicle after which he claimed to have made a telephone call for assistance to the fire depart-

---

SERGEANT RUANE: "I brought Mr. Messere down to the cell block and I was putting him in the cell and I told him that I and Trooper Murphy didn't feel he was telling us the complete truth."

PROSECUTOR: "And what did he say to you if anything?"

SERGEANT RUANE: "I also said at that time, 'Look, why don't you get hold of your attorney and we will sit down and talk about it.'"

PROSECUTOR: "And did he answer you?"

SERGEANT RUANE: "Yes. He said no."

PROSECUTOR: "Did you have any further conversation?"

SERGEANT RUANE: "He said, 'Can I say something to you between you and I?'"

PROSECUTOR: "And what did you answer?"

SERGEANT RUANE: "I told him it wouldn't be fair for me to say yes because whatever he told me, I would have to tell Trooper Murphy."

PROSECUTOR: "Did he say anything else to you?"

SERGEANT RUANE: "He said, 'Well, I'll tell you this, that the guy was alive when I left.'"

PROSECUTOR: "And what did you say to him after he made that statement?"

SERGEANT RUANE: "I said, 'Why don't you tell Trooper Murphy that.'"

PROSECUTOR: "What did he say to you then?"

SERGEANT RUANE: "He didn't seem to like Trooper Murphy. I think he said he was a hard ass, and I told him, I said, 'It's 4 o'clock in the morning and we are all tired. If you have got something to say, why don't you tell Trooper Murphy what you just told me.'"

PROSECUTOR: "And what did he say to you?"

SERGEANT RUANE: "He agreed to talk to Trooper Murphy."

ment from a public telephone outside a variety store. Upon completion of this statement, the defendant expressed no desire to remain silent or to consult an attorney. Between 4:15 and 5:00 A.M., he was returned to his holding cell.

At about 5:00 A.M. Canton police Detective Vincent M. Rafferty went to the defendant's cell. Since the defendant was the only person in custody, it could be inferred from Rafferty's testimony that he was required to check on the defendant's safety approximately every thirty minutes. Rafferty had been on the police force for about eighteen years and had known the defendant for about the same period. On three or four prior occasions, Rafferty had arrested the defendant and had given him Miranda warnings. Rafferty testified that he was "fairly friendly" with the defendant, that he had not been present when the defendant was booked or when he spoke with Officers Murphy and Ruane, and that he had not previously talked with the defendant that morning. In the course of his check, Rafferty said to the defendant: "Boy, you got yourself in a mess this time, Joe. You are in a real good one and they have . . . a good case against you." The defendant responded by indicating that Trooper Murphy was a "real hard ass." Rafferty replied that he "had known [Murphy] for quite a period of time and that he was always a nice guy as far as I was concerned." The defendant then asked Rafferty, "If this was self-defense, wouldn't I be able to get a manslaughter?" Rafferty replied that Murphy was in charge of the investigation and he would have to talk to him. Rafferty left and reported the conversation to Murphy, who indicated that he did not wish to speak with the defendant again. Rafferty returned to the cell, informed the defendant of Murphy's response, then left the area and went off duty. Rafferty further testified that he had not intended to engage the defendant in conversation.

The final witness at the voir dire was an attorney from Quincy who testified that he had known the defendant for approximately eight to ten years. The defendant made a telephone call to the attorney at his home sometime between 7:00 and 7:30 A.M. on the morning of October 16 to

arrange for representation at his arraignment. The attorney testified that he told the defendant "to say nothing, of course, the way I have told him for many years in the past. He has always had my card with him, which indicates his rights under the Fifth and Sixth Amendment[s] to remain silent." The defendant informed the attorney that he had "told the police he wasn't going to say anything . . . until [I] came down."

Based on this evidence, the judge concluded that the defendant's knowledge of his Miranda warnings was "extensive"; that he had made a voluntary, knowing and intelligent waiver of his rights; that he had been asked on several occasions whether he desired an attorney and had declined the assistance of counsel on each occasion; and that his statements to the police were "spontaneous." The judge ruled that the challenged statements were admissible and ordered the motion to suppress denied.

The defendant concedes that he understood each set of Miranda warnings and that he knowingly, voluntarily and intelligently waived his rights prior to giving his first statement to Trooper Murphy. He contends, however, that his indication to Murphy at the completion of that statement that he had nothing further to say constituted an unequivocal exercise of his right to remain silent. Based on that assumption, he argues that his subsequent statements to Officers Ruane, Murphy, and Rafferty amounted to "interrogation" within the definition given to that word in *Rhode Island* v. *Innis*, 446 U.S. 291, 300-302 (1980), in violation of the requirement that the police must scrupulously honor a defendant's assertion of his right to terminate questioning.[4]

---

[4] The judge's conclusion that the defendant's remarks were "spontaneous" after receipt, understanding and waiver of cumulative sets of Miranda warnings suggests implicit rejection of the defendant's arguments. Although the judge's reasoning on the legal questions could have been more fully developed, the uncontradicted nature of the evidence puts us in a position where the constitutional issues can be satisfactorily resolved in accordance with applicable standards of review. See *Commonwealth* v. *Moon*, 380 Mass. 751, 755-756 (1980), and cases cited; *Commonwealth* v. *Doyle*, 12 Mass. App. Ct. 786, 795 n.3 (1981), and cases cited.

See *Miranda* v. *Arizona*, 384 U.S. 436, 474-479 (1966); *Michigan* v. *Mosley*, 423 U.S. 96, 103-104 (1975); *Commonwealth* v. *Brant*, 380 Mass. 876, 883-884 (1980); *Commonwealth* v. *Gallant*, 381 Mass. 465, 467-468 (1980). See also *Commonwealth* v. *Dustin*, 373 Mass. 612, 616 (1977), cert. denied, 435 U.S. 943 (1978); *United States* v. *Olof*, 527 F.2d 752, 754 (9th Cir. 1975).

We do not think the defendant's remark to Trooper Murphy constituted an assertion of his right to remain silent. The remark followed the defendant's lengthy and detailed account of his whereabouts on the night of October 3 and the morning of October 4. The record indicates that the statement was offered in narrative form without any prodding or questioning by Murphy. The defendant did not unequivocally state at its completion that he did not wish to be questioned any further, contrast *Commonwealth* v. *Gallant, supra* at 466, 467-468, nor did he request the presence of a lawyer. Contrast *Commonwealth* v. *Brant, supra* at 879-880, 882-883. Read in context the remark suggests that the defendant had exhausted his memory about details of his activities at critical times. The police could properly conclude that the defendant had not said or done anything which would require them to avoid further conversation with him. It follows that his later statements to Officers Ruane, Murphy and Rafferty, all of which came within a short period of time following receipt of six sets of Miranda warnings, were admissible.[5]

---

[5] On an independent basis, it does not appear that the conversations with Officer Ruane (see note 3, *supra*) or with Officer Rafferty constituted improper custodial "interrogation." See *Rhode Island* v. *Innis, supra* at 300-302. Ruane's comment about the defendant's credibility was linked to immediate and specific advice concerning the defendant's need for counsel. Despite that advice, the defendant expressed no desire to consult a lawyer but instead attempted to play the officers off against each other by telling Ruane that he was inclined to make a confidential disclosure, an offer the officer properly rejected. The Rafferty conversation (which began with a statement of fact probably already known to the defendant) essentially involved an attempt by the defendant to use his familiarity with Rafferty to solicit advice on a question he considered important to his own self-interest. In both circumstances, the statements by the offi-

In concluding that no constitutional impropriety occurred, we have considered several other factors obvious from the record. There is no claim of physical coercion, or any suggestion that the defendant's faculties were impaired by alcohol or drugs. There is nothing to indicate that the police threatened, cajoled, tricked or deceived the defendant into making statements. Contrast *Commonwealth* v. *Dustin, supra; Commonwealth* v. *Jackson,* 377 Mass. 319, 329 (1979). It is apparent that, at the time of arrest, the police had developed a strong case against the defendant. They thus had less incentive to seek incriminating statements, as they might from a mere suspect. Finally, the defendant was familiar with police procedures. He ignored repeated advice about the right to and need for counsel, choosing, it appears deliberately, to wait until 7:30 A.M. on October 16 to call a lawyer. Compare *Edwards* v. *Arizona,* 451 U.S. 477, 478-480 (1981). The record suggests a case in which the defendant intelligently and voluntarily exercised independent judgment not to become "imprison[ed] . . . in his privileges." *Michigan* v. *Mosley, supra* at 109 (White, J., concurring), quoting from *Adams* v. *United States ex rel. McCann,* 317 U.S. 269, 280 (1942). The motion to suppress was properly denied.

2. In the course of his instructions to the jury, the judge made the following statement: "That issue [of self-defense] is raised by a statement made by the defendant to the police concerning something that occurred down the road where this incident took place, that is, where the victim was found. But it isn't enough for the jury to find that the defendant made that statement. [You] *must also find that that is actually what occurred down the road.* Once you make the factfinding function, if you do perform that factfinding function, then you apply the law as to self-defense. Otherwise, you don't apply it because it has no application unless there are facts found by you to substantiate it." (Emphasis

---

cers which began the conversations were frank and truthful, and their testimony that they had not expected any response is entitled to weight.

supplied.) The defendant argues that the emphasized language impermissibly shifted the burden of proof on the issue of self-defense to him. See *Connolly* v. *Commonwealth*, 377 Mass. 527, 532-536 (1979). We disagree.

In the course of an instruction on self-defense, the use of the word "find" should be avoided. It is not, however, a talisman of automatic error. See *Commonwealth* v. *Carballo*, 381 Mass. 227, 230 (1980); *Commonwealth* v. *Simmons*, 383 Mass. 40, 44 (1981). Rather, the charge must be examined in its entirety, see *Commonwealth* v. *Stokes*, 374 Mass. 583, 590-591 (1978), to ascertain if the offending language could have misled a reasonable juror with respect to the burden of proof. See *Sandstrom* v. *Montana*, 442 U.S. 510, 514 (1979). In the course of his fifty-four pages of instructions, the judge furnished the jury with complete and correct instructions on the law of self-defense and its application to the present case. Moreover, the judge specifically instructed, in unequivocal language on three separate occasions, that the Commonwealth had to establish the absence of self-defense by proof beyond a reasonable doubt. We see no likelihood that a reasonable juror could have interpreted the challenged instruction as requiring the defendant to prove any fact, see *Commonwealth* v. *Simmons, supra* at 44-45, and cases cited; cf. *Commonwealth* v. *Medina*, 380 Mass. 565, 577-578 (1980), a conclusion likely shared by the defendant's trial counsel, who failed to object to the instruction at the conclusion of the charge.

3. Serious dereliction of trial counsel is claimed in his handling of the disclosure of the identity of the witness Doris Souris who, it will be remembered, testified that the defendant had offered to pay her $1,000 if she would falsely state at trial that she had witnessed the defendant kill the victim in self-defense.

This witness's name arose in the course of two bench conferences. She was identified initially as a possible defense witness in response to the judge's request for a list of prospective witnesses for their disclosure to the jury. Before she

was actually called, defense counsel advised the judge that her name had been included as a possible defense witness at the defendant's request, although he had not previously interviewed her. The police talked with Souris two days after they received the list. As a result of that interview, the prosecution decided to call her as part of its case. It is now argued that defense counsel's failure to interview Souris, and his disclosure of her identity, was serious incompetency which likely deprived the defendant of a substantial ground of defense. See *Commonwealth* v. *Saferian*, 366 Mass. 89, 96-97 (1974).

The record suggests that defense counsel may have refrained from interviewing Souris because of the defendant's representation to him that she would provide favorable testimony of self-defense. Any counsel in a criminal case who fails to interview a material witness leaves himself open, of course, to a possible claim of ineffective assistance. See *Commonwealth* v. *Sellon*, 380 Mass. 220, 226 (1980). But the damaging testimony which ultimately emerged here was not the result of any failure on the part of defense counsel. Rather, it was caused by the defendant's own misconduct in soliciting perjury and then attempting to deceive his own counsel.[6] A defendant caught in his own trap cannot expect an appellate court to provide a release by an order for new trial. There is nothing in this incident, or in the trial as a whole, which suggests that defense counsel was incompetent, inefficient or inattentive to his client's interests. The record demonstrates that defense counsel presented and argued the defense vigorously and ably, and that counsel's skill probably averted the defendant's conviction of murder in the first degree. We conclude that defense counsel's performance was competent.

*Judgment affirmed.*

---

[6] It also appears that the police knew that the defendant had attempted to obtain perjured testimony from Souris prior to her inclusion on the list of witnesses prepared by defense counsel.