Garsh, J.
The defendant, Robert McNickles (“McN-ickles”), was indicted on September 24, 1993 for the kidnapping, rape, and murder of his cousin, Takeisha McNickles, and the kidnapping and murder of his uncle, Thomas McNickles. On October 6, 1992, McNickles was arrested by his parole officer because he was a suspect in this double murder. While in the custody of the parole board, he made certain statements that he now moves to suppress. As grounds for this motion, the defendant asserts that the exercise of his right to remain silent was not scrupulously honored.
After a hearing on July 15, 1994, the court allows the defendant’s motion.
FINDINGS OF FACT
On October 6, 1992, Sergeant Paul Barnicle (“Barni-cle”), a seventeen-year veteran of the Boston Police Department, called the central office of the parole board (“central office”) and informed the parole board that McNickles was a suspect in a homicide and that he had made statements contradictory to other evidence. The defendant’s status as a suspect enabled the parole board to issue a warrant for the defendant’s custody pursuant to G.L.c. 127, §149A.[1] Barnicle expressed the desire to interrogate McNickles if he were arrested.
As a result of this conversation, Charles Howard (“Howard”), a parole officer with ten years tenure, arrested the defendant on a warrant for temporary custody. Howard was familiar with McNickles as he had been assigned to his case eight months before the arrest. I find Howard’s testimony to be entirely credible. He exhibited a detailed and consistent memory of the circumstances surrounding the arrest and interrogation on October 6.
At the Roxbury Parole Board Office, where he arrested the defendant, Howard read McNickles his Miranda rights. Howard informed McNickles that a detective, who would be at the central office, wanted to speak to him, and that if the defendant could convince the detective that he should not be a suspect, then he might be released immediately by the parole board. Howard also advised McNickles that he was not obligated to speak to the police.
A parole board supervisor let Barnicle know that the defendant had been arrested and was on his way to the central office. Barnicle and a fellow officer went directly there; they sought and received permission of the chief parole supervisor to speak with the defendant. McNickles met with the police in the office, and in the presence of the chief parole supervisor. Also there throughout the interrogation were the assistant chief and at least one other parole officer besides Howard.[2] Howard was in charge of the prisoner’s custody throughout the interview.
Barnicle, who did the questioning, began by reading the defendant his Miranda rights. McNickles agreed to speak. I find that McNickles understood his rights and was not under the influence of any drugs or alcohol at the time. I find that the defendant made a knowing and intelligent waiver of those rights and voluntarily responded to questions posed by Barnicle.
The interrogation ended abruptly after approximately one hour and a quarter. McNickles had protested that he was not the perpetrator and that “(he) didn’t do it.” Barnicle countered by saying something to the effect that “we have found fingerprints on her body . . .’’[3] He then warned McNickles that the prints had sent out for analysis and that, when the results come back, “we’ll nail you.” The defendant replied, “I don’t want to talk to you anymore.”
Howard immediately understood McNickles to have exercised his right not to be interrogated further. He turned to his supervisor for advice on how to proceed. Howard was directed to take the defendant to MCI Concord.
Barnicle provided inconsistent and changing versions of his interview with the defendant. He first *404 testified that McNickles did not respond to his comment about the fingerprints, but that, at some point, the defendant “did say he didn’t want to talk anymore,” although Barnicle was “not sure” if that remark was uttered shortly after his own statement about the prints. Barnicle then contradicted himself and testified that McNickles did not state that he did not want to talk anymore. Instead, the defendant, according to Barnicle, stated: “I have nothing else to say about that.” Initially, Barnicle testified that he did not know if the statement “I have nothing else to say about that” was about the fingerprints. Then he testified that he did not “believe" it came at the point of the inquiiy about the fingerprints. Finally, Barnicle testified that it was not uttered with respect to the fingerprints, but rather followed Bamicle’s having pointed out to McNickles some inconsistency in what he had told him. With respect to precisely how the interview ended, Barnicle seemed to rely more on his common practice than on a detailed memoiy of this incident. Barnicle acknowledged that he interviewed the defendant twenty months prior to his in-court testimony and that he has conducted many other interrogations since then.
Therefore, I credit Howard’s testimony and find that the defendant asserted his right to discontinue all questioning when he said that he did not want to talk anymore.[4] I also find that both Barnicle and Howard were aware of the assertion by McNickles of his right to remain silent and that the questioning stopped at that time.
After the interview ended, Howard took McNickles into an adjacent room where he spoke to him about drug testing and, then, ten to tweniy minutes after the interrogation had ended, he led the defendant, in waist chains and handcuffs, to a car. Almost immediately after entering the car, Howard, without reiterating any Miranda rights or inquiring if the defendant wished to speak with him, initiated a conversation with the defendant. McNickles was sitting in the back seat directly behind Howard. Howard remarked: “Well, this is good. The detective has fingerprints. When the results come back, they will show it was not you and you’ll be in the clear.”
When he made those statements, the defendant’s status as a suspect was of interest to Howard as a parole officer because it was the sole basis upon which Howard had taken McNickles into custody. Howard was aware that there might be a preliminary parole revocation hearing within fifteen days, and he believed that Barnicle’s reference to fingerprints on the body would be addressed at such a hearing. He know that McNickles had not yet been indicted.[5] Howard, as he testified, expected that the defendant would respond to his overture. The following colloquy ensued:
Defendant: “Detective said fingerprints all over the body?”
Howard: “Yes.”
Defendant: “On the tits too?”
Howard: “Yes, that’s what he said.”
Defendant: “Not on the tits.”
Howard claims that the latter remark was said with a certain inflection and raised voice. Nothing further was said by Howard or by McNickles on the ride. Howard promptly reported the substance of his conversation with McNickles to his immediate supervisor.
Defendant now moves to suppress evidence of statements he made to the parole officer while in custody in the car en route to MCI Concord.
RULINGS OF LAW
It is undisputed that the defendant was in the custody of the parole board at the time he made the statements in question. It is equally undisputed that Miranda warnings were properly read to and understood by the defendant on two occasions earlier that day: when he was first arrested by the parole officer and before he was questioned by the police.
Therefore, the questions that must be answered are (1) whether McNickles reasonably could have been understood as having invoked his right to remain silent, (2) whether Howard’s remarks to McNickles in the car constituted “interrogation” and, if so, (3) whether this interrogation violated the defendant’s Fifth Amendment rights.
1. Invocation of the Right to Remain Silent
A defendant who initially has waived his right to remain silent may stop questioning at any time. Commonwealth v. Brant, 380 Mass. 876, 884 (1980). However, he must indicate in some manner that he is invoking the right he previously waived. Commonwealth v. Bradshaw, 385 Mass. 244, 265 (1982), citing Miranda v. Arizona, 384 U.S. 436, 473-74 (1966).
Here, McNickles clearly said that he no longer wished to speak. As a result, the questioning immediately stopped and he was removed from the room, a further indication that McNickles had just exercised his constitutional right to remain silent. Once a defendant invokes the right to remain silent, interrogation must cease. Michigan v. Mosley, 423 U.S. 96, 100 (1975), quoting Miranda v. Arizona, 384 U.S. at 473-74.
At the very least, the statement “I don’t want to talk to you anymore” appears “to have far more likely indicated an intention to invoke the right to remain silent [with respect to all the government agents present] than an intention to waive that right [with respect to some, but not all, of the government agents present].” Commonwealth v. Cobb, 374 Mass. 514, 519 (1978). Moreover, no attempt was made to ascertain if the defendant wanted to limit his assertion to the police department. Cf. United States v. Ramsey, 992 F.2d 301 (11th Cir. 1993) (equivocal assertion of the right to remain silent limits further questioning to clarification of the suspect’s intentions).
The Commonwealth argues that even if Howard’s version of the interview in the central office were the *405 correct one, as the court has found, McNickles did no more than exercise his right to remain silent vis-a-vis the police department, but not vis-a-vis the parole board. Such a holding would square with neither the letter nor spirit of Miranda. On the facts of this case, the parole board and the police department were inextricably intertwined and cooperative with each other. The police department informed the parole board that McNickles was a suspect; the parole board informed the police department when he had been taken into custody because of his being a suspect; the police department sought permission from the parole board to interrogate the defendant; the parole board took the unusual step of bringing a parolee to the central office for questioning by the police and encouraged McNickles to speak by advising him that, if he should convince the police department of his lack of involvement, he likely would be released immediately from custody; the police interrogated McNickles; the parole board listened. When, as here, two independent governmental agencies cooperate and members of both are present during an interrogation, the unequivocal assertion by a defendant of his right to remain silent must be presumed to be more than an unwillingness merely to speak with a particular arm of the government.
When McNickles told the assembled group of government agents that he did not want to talk to them anymore, he expressly invoked his right to remain silent. He did not limit invocation of that right to the police department.
2. Interrogation
It is “interrogation” that must cease once a defendant invokes his right to remain silent. “Interrogation” refers not only to express questioning, but also to its “functional equivalent," that is, “any words or actions, other than those normally attendant to arrest and custody, that the authorities should have known were reasonably likely to elicit an incriminatory response." Commonwealth v. D’Entremont, 36 Mass.App.Ct. 474, 478 (1994); Commonwealth v. Williams, 388 Mass. 846, 854 (1983).
The functional equivalency test is an objective assessment as to whether the authorities’ statements “would be perceived as an interrogation by a reasonable person in the same circumstances.” Commonwealth v. D'Entremont, 36 Mass.App.Ct. at 479, quoting United States v. Taylor, 985 F.2d 3, 7 (1st Cir. 1993). However, the officer’s testimony that he expected the defendant to respond is entitled to some weight. See Commonwealth v. Messere, 14 Mass.App.Ct. 1, 8-9 n.5 (1982) (testimony by officers that they expected no response is entitled to weight); United States v. Taylor, 985 F.2d at 8; Arizona v. Mauro, 481 U.S. 520, 528-29 (1987).
Here, unlike Messere, the officer testified that he did expect a response from the defendant. Furthermore, his statement related directly to the topic that caused the cessation of the police interview. In fact, Howard’s statement, suggesting that the fingerprint results would exonerate the defendant, was precisely the positive counterpart to Barnicle’s statement that the results would inculpate the defendant.
Barnicle: “When the results come back, we’ll nail you.”
Howard: “When the results come back . . . you’ll be in the clear.”
While the court recognizes that Howard was not deliberately attempting to elicit a confession, he should have known that the formulation of his opening remarks to the defendant reasonably was likely to elicit a potentially incriminating response.[6] An incriminating response includes “any response — whether in-culpatoiy or exculpatory — that the prosecution may seek to introduce at trial.” Rhode Island v. Innis, 446 U.S. 291, 301 n.5 (1980) (emphasis in original).
Therefore, this court concludes that Howard’s statements constituted custodial interrogation.
3. Violation of Fifth Amendment Rights
After a defendant has asserted his right to remain silent, interrogation may resume only if the defendant’s rights are “scrupulously honored.” Commonwealth v. D'Entremont, 36 Mass.App.Ct. at 477, quoting Michigan v. Mosley, 423 U.S. at 104-06 (questioning resumed by different officer only after passage of significant period of time, provision of fresh set of warnings, and second interrogation related to crime not subject of earlier interrogation).
Here, unlike Mosley, the subsequent questioning occurred after a brief hiatus. It began without a fresh set of warnings. McNickles was not asked if he wished to change his mind about remaining silent. In addition, the parole officer’s comment was particularly provocative as it related directly to the last topic discussed with Barnicle, the topic that precipitated the defendant’s invocation of his Miranda right. Circumstances had not changed significantly since the time of the original questioning.
The court cannot agree with the Commonwealth that a parole officer/custodian, present during an interview when a suspect has announced that he wants to answer no more questions, may question the suspect a few moments later simply by removing him from the presence of the police interrogators. “Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.” Miranda v. Arizona, 384 U.S. at 473.
“How far, if at all, constitutional considerations applicable to an interrogation by a [parole] officer are different from those applicable to an interrogation by a police officer,” Furtado v. Furtado, 380 Mass. 137, 147 (1980), need not be resolved here. The incriminating statements were not obtained “by luck or happenstance.” Maine v. Moulton, 474 U.S. 173, 176 (1985). Howard was not acting as a private citizen and there *406 can be no question that the interrogation by Howard constituted “custodial” interrogation, which is defined as “questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” (Emphasis in original.) Rhode Island v. Innis, 446 U.S. 291, 298 (1980), quoting Miranda v. Arizona, 384 U.S. at 474. Cf. Commonwealth v. A. Juvenile, 402 Mass. 275, 278-79 (1988) (DYS supervisor under duty to report juvenile’s crimes to police not acting as private citizen in eliciting juvenile’s confession).
In sum, the further questioning of McNickles, who was continually in custody, failed to scrupulously honor his right to cut off questioning.[7]
ORDER
It is therefore ORDERED that the defendant’s motion to suppress be ALLOWED.

 That statute provides that “(i]f a parole officer believes that a parolee has lapsed . . . into criminal ways or has associated . . . with criminal company or that he has violated the conditions of his parole, the parole officer may, with the consent of a parole supervisor or other superior officer . . . issue a warrant for the temporary custody of said parolee for a period not longer than fifteen days . . ."

 Howard testified that bringing a parolee arrested on a warrant for temporary custody to the central office for questioning by the police, rather than directly to the place of detention, was an uncommon procedure. This explains, in part, why Howard’s recollection of the incident is especially vivid and credible.

 The testimony of Howard differs from that of Barnicle on this matter. Howard recalls Barnicle saying that the fingerprints were “on the tits and all over.” The court need not make a finding as to the exact language used. Of course, if Barnicle did not indicate that prints had been found “on the tits,” then the statements which defendant seeks to suppress would be more incriminating.

 The assertion of this right was not limited to questions regarding fingerprints on the body.

 A grand jury indictment constitutes a valid substitute for a preliminary parole revocation hearing. 120 C.M.R. §303.12.

 The “bad guy/good guy" routine is a recognized technique of interrogation. Had fresh Miranda warnings been given by Howard, that type of questioning would not have been objectionable. The fact that Howard was not acting at the request, or with the foreknowledge, of Barnicle does not alter how McNickles reasonably would have perceived the situation. Commonwealth v. D'Entremont, 36 Mass.App.Ct. at 479.

 It does not follow that the police department has an affirmative duty to warn the parole board whenever a defendant has asserted his right to remain silent. However, where parole officials are privy to a defendant’s assertion of rights, they are not free to disregard it by asking further questions that could not have been asked by the police officers themselves.