COMMONWEALTH *vs.* JEFFREY A. BRANT.

Norfolk.  April 8, 1980. — June 18, 1980.

Present: HENNESSEY, C.J., QUIRICO, WILKINS, & BRAUCHER, JJ.

*Evidence,* Admissions and confessions.  *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights, Assistance of counsel. *Waiver.  Practice, Criminal,* Instructions to jury, Comment by prosecutor.

Where law enforcement officials informed a defendant after he had expressed his desire not to answer any questions until his attorney was present that a confederate had already made a statement and allowed the defendant to confer with his confederate, and where immediately after the conference the defendant informed the officials that he wished to make a statement, the defendant's decision to cut off questioning was not scrupulously honored and admission of the statement at trial was reversible error.  [882-886]

At the retrial of a robbery indictment it would be improper to admit evidence of the defendant's failure to respond when his codefendant made certain statements to law enforcement authorities, or to comment on such failure.  [886-887]

INDICTMENT found and returned in the Superior Court on February 27, 1978.

A motion to suppress was heard by *Young,* J., and the case was tried before *Linscott,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Thomas P. McCusker, Jr.,* for the defendant.

*Charles J. Hely,* Assistant District Attorney (*Gerald M. Kirby,* Assistant District Attorney, with him) for the Commonwealth.

HENNESSEY, C.J.  This is an appeal by the defendant Brant under G.L. c. 278, § 33A-33G, from his conviction for armed robbery while masked.  Prior to trial Brant filed a motion to suppress statements.  After a hearing the motion

was denied in part and Brant filed his exception. The case was tried before a jury, Brant was found guilty, and the trial judge imposed a sentence of not less than eighteen years nor more than thirty years at the Massachusetts Correctional Institution at Walpole. Brant claimed an appeal, asserting as errors the denial of his motion to suppress an inculpatory statement given by him to authorities and the allowing of a certain closing argument to the jury by the prosecutor involving the defendant's right to remain silent. The Appeals Court, with one judge dissenting, concluded that there was no error and that the judgment should be affirmed. 8 Mass. App. Ct. 558 (1979). We conclude that there was error in the motion judge's denial[1] of the motion to suppress Brant's statement and that the judgment of conviction must be reversed. In reaching this result we observe that neither the motion judge nor the Appeals Court had the benefit of *Rhode Island* v. *Innis*, 446 U.S. 291 (1980), upon which we rely in part in this opinion, and which, to say the least, brings new shades of meaning to the issues raised in this case.

We summarize the facts as found by the motion judge and from our own reading of the trial transcript. On the night of December 28, 1977, a food store in Norwood, Massachusetts, was robbed by two masked men, one of whom carried a rifle or a sawed-off shotgun. A woman clerk was shot and seriously wounded by one of the robbers, who then escaped. Brant and one Kampen were arrested in Titusville, Florida, on February 4, 1978, after a high-speed automobile chase which involved the exchange of gunfire. Kampen was booked at 9:30 A.M. and Brant, who had eluded his pursuers somewhat longer, was booked at 2:10 P.M. During the booking procedures, each was informed of his Miranda rights and each was specifically asked whether he wished to call the public defender. Kampen said only that he would see the public defender in court that morning,

---

[1] It will be noted that the trial was held before a different judge from the one who ruled upon the motion to suppress.

while Brant requested and was permitted to call the public defender.

On Sunday, February 5, 1978, both Kampen and Brant were brought into court for a proceeding which, the parties stipulated, involved the setting of bail and a probable cause hearing on certain Florida charges. The Florida public defender appeared and represented both defendants.

Following this hearing Kampen and Brant were held in custody at the Brevard County jail, one of a complex of buildings in the county seat, which included the sheriff's office and, across the street, the courthouse. Kampen and Brant were held in separate cell blocks and could not converse with each other. Each of the defendants was told by other prisoners that, if they were convicted and sent to one of Florida's State prisons, they would be subject to homosexual assaults.

On February 13, 1978, the Florida public defenders' office was relieved by court order from representing Kampen and Brant due to a conflict of interest between these defendants and a juvenile apprehended with them. On that same day, Assistant District Attorney Tiernan of Norfolk County, Massachusetts, telephoned Deputy Sheriff Hudepohl of Florida and requested that he seek to interview Kampen and Brant concerning the incident which is the subject of the present indictments.

Hudepohl arrived at the jail sometime shortly before 10 A.M. and asked to have Kampen and Brant brought to him. Kampen arrived first and was taken by Hudepohl into a small interview room adjacent to the main control room of the jail. He first informed Kampen that he wished to interview him concerning Massachusetts offenses. Hudepohl also told him that Tiernan had called and said that he wanted Kampen's side of the story. Hudepohl cautioned Kampen that he would not inquire about the Florida charges and carefully read him his Miranda rights, making sure after each question that Kampen understood. Hudepohl then asked Kampen, "Do you wish to talk with me now without a lawyer?" Kampen said, "Yes." Kampen proceeded to

give Hudepohl an inculpatory statement which, when transcribed, covered six pages.

The motion judge found that, at the time Kampen first spoke with Hudepohl, he was calm and collected and quite familiar with his Miranda rights, not only from his Florida experiences, but from earlier occasions on which those rights had been read to him. The judge also found that Kampen's "will was not overborne by the circumstances of his incarceration nor his concern over the results of conviction in Florida; and . . . that [Kampen] knowingly, intelligently and voluntarily waived his Fifth Amendment rights guaranteed under *Miranda* and its progeny and his Sixth Amendment right to have his attorney present."

Upon completion of the interview Hudepohl and Kampen left the interview room and Kampen was permitted to speak briefly with Brant in the main control room. Hudepohl next informed Tiernan of Kampen's incriminating statement, and Tiernan promptly secured complaints against Kampen in the District Court of Norfolk for armed robbery, while masked, and assault with intent to murder. Tiernan and Detectives Fruci and Casey then left for Florida.

On the morning of February 15, 1978, Hudepohl returned to the Brevard County jail with Kampen's earlier taped statement, now transcribed. Kampen, still appearing calm and cooperative, signed the six page statement before a notary. Later that morning, Kampen and Brant were taken to the courthouse where new counsel were appointed to represent each of them, and they were arraigned on the Florida charges. Assistant District Attorney Tiernan and Officers Casey, Fruci and Hudepohl were in court during the arraignment of the defendants and knew that they were represented by counsel, Attorney Norwich having been appointed for Kampen and Attorney Cossaboom having been appointed for Brant. Further, the Massachusetts authorities and Hudepohl, by that time, had formed the intention to interrogate Brant later that day.

After their arraignment, Kampen and Brant were returned to jail. Later that afternoon they were brought into

the jail interview room where Tiernan, Casey, Fruci and Hudepohl had assembled. At 4:57 P.M. Hudepohl turned on his tape recorder and began to read Brant his rights from a document entitled, "Brevard County Sheriff's Department Interrogation Preamble." This form contained the printed question, "Are you willing to proceed without an attorney being present to represent you?" This question was followed by a blank space for the answer of the person being interviewed. When Hudepohl read this question to Brant, Brant replied, "No." Hudepohl wrote this response on the form and confirmed that Brant refused to answer any further questions without his counsel being present. One of the Massachusetts authorities then interjected the fact that Kampen had already made a statement to the police, and Hudepohl confirmed to Brant that this was so and that Kampen's statement had already been signed and notarized. The motion judge found that the authorities, in using these words and conduct, "hoped and expected" that Brant would make a further statement. Hudepohl then turned off the tape recorder.

Kampen remarked that his statement was "all lies," and Brant asked for a moment to speak with Kampen privately. He was afforded this privilege. Fourteen minutes after the interrogation had ceased, Brant and Kampen returned to the interview room and Brant asked that the tape recorder be turned back on as he wished to make a statement. Hudepohl complied, directing Brant's attention to the interrogation preamble, specifically the question of Brant's willingness to proceed without an attorney being present to represent him. Brant himself crossed out the response, "No," wrote in, "Yes," and signed his name, indicating his willingness to give a statement without his attorney being present. Brant indicated that he had changed his mind about giving a statement of his own free will, without any threats or promises.

Although Brant stated he wished to make a statement, further proceedings followed a question and answer format, Hudepohl asking Brant certain questions and Brant re-

sponding. At one point Kampen volunteered a response when Brant hesitated, or seemed uncertain, and one of the Massachusetts authorities began to follow up Kampen's response. Hudepohl then specifically reminded Kampen of his Miranda rights, and asked him expressly, "In light of all that, do you still wish to talk to us without having an attorney here, or your attorney of record here in Brevard County?" Kampen responded, "Yeah." Thereafter both Brant and Kampen were asked further questions and responded thereto. Both Kampen's and Brant's statements were incriminating, the statements virtually amounting to a confession to the Massachusetts offenses.

On Friday morning, February 17, 1978, the statements made on the fifteenth having been transcribed, Kampen and Brant were given an opportunity to read the twenty-page transcription of their joint statement. Both defendants read the joint statement, initialed each page, and then executed an affidavit stating that the facts set forth therein were "true and correct." Later that day, Kampen and Brant were returned to court where, on the advice of their appointed counsel, who were present, they each waived extradition to Massachusetts, agreeing voluntarily to return and face the Massachusetts charges.

Kampen and Brant were delivered into the custody of the Massachusetts authorities on the morning of February 18, 1978. Brant seemed happy to be returning to Massachusetts. Both defendants were observed to be in complete control of their faculties. Handcuffed, each defendant was placed in the back seat of an automobile where they were joined by Detective Casey. Detective Fruci and District Attorney Tiernan sat in the front seat, Tiernan driving. On the way to the airport, there was casual conversation among the three individuals in the back seat which included further inculpatory statements by Kampen and Brant.

The motion judge excluded the affidavits executed by the defendants, as well as a portion of the twenty-page transcription of their joint statement. He also excluded from evidence the admissions made by the defendants while rid-

ing to the airport in the automobile. He denied Brant's motion to suppress the entire twenty-page statement, and most of it was received in evidence. The judge stated that each of the various incriminatory statements made by the defendants was made "intelligently, knowingly and voluntarily, free of coercion and without the will of either defendant being overborne in any respect."

1. This case is a close one, but nevertheless we think reversal of the defendant's conviction is required. The defendant first argues that his Sixth and Fourteenth Amendment right to counsel was violated, in that the authorities deliberately contrived to elicit incriminating information from him in the absence of his counsel. See *Massiah* v. *United States,* 377 U.S. 201, 206 (1964). While it is clear that the police and prosecutor here arranged a questioning session with the defendant, apparently without notifying his Florida-appointed attorney, we think we need not consider this aspect further, because consideration of the Miranda Fifth Amendment principle is dispositive.

Once warnings have been given (as they were here) the subsequent procedure is clear: If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. *Miranda* v. *Arizona,* 384 U.S. 436, 474 (1966). The rule is that the defendant's decision to cut off questioning must be "scrupulously honored." *Miranda, supra* at 474, 479. The defendant's rights were not so honored here.

After the defendant stated his decision to remain silent and that decision had been noted in writing, one of the Massachusetts authorities interjected the fact that Kampen had already made a statement to the police. A Florida officer confirmed that this was so and that Kampen's statement had already been signed and notarized. The defendant then conferred privately with Kampen for fourteen minutes. He then stated his willingness to proceed without an attorney present to represent him, and he made a written notation confirming that fact. Then the defendant made his inculpatory statements.

We first consider whether Brant was subjected to "interrogation," within the meaning of *Miranda,* after he had invoked his privilege to remain silent. We conclude that he was interrogated. Not all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation. "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda, supra* at 478. A "compelling influence" is not necessarily in the form of express questions. The inquiry here is whether the authorities used any words or actions, other than those normally attendant to arrest and custody, that they should have known were reasonably likely to elicit an incriminatory response from the suspect. *Rhode Island* v. *Innis,* 446 U.S. 291, 301 (1980). The test is an objective one. Thus where, as in this case, the motion judge found that the authorities "hoped and expected" that the defendant would change his mind and make a statement as a result of the authorities' further statements and their permitting the private interview between Brant and Kampen, the intent of the authorities is not conclusive. Nevertheless, their intent bears on whether they should have known that their words and actions were likely to evoke an incriminating response. Since the motion judge found, as warranted by evidence produced at the hearing on the motion to suppress, that their words and conduct were designed to elicit an incriminating response from Brant, it is indicative that the practice was one which they should have known was reasonably likely to have the effect. *Id.* at 301 n.7. We conclude that the defendant was "interrogated" by the authorities in violation of his undisputed rights under *Miranda* to remain silent.

The Commonwealth here relies upon *Michigan* v. *Mosley,* 423 U.S. 96 (1975), wherein the Supreme Court held that, in the circumstances of that case, a second interrogation of the defendant, although made after he had invoked his right to cut off questioning, nevertheless resulted in admissible inculpatory evidence against the defendant. In *Commonwealth* v. *Taylor,* 374 Mass. 426, 432-433 (1978), we sum-

marized the significant holdings of *Mosley* as follows: "In *Mosley*, the Supreme Court explored the question whether and in what circumstances the prosecution is prohibited from using a defendant's in-custody statement obtained after the right to remain silent had been invoked. The Court viewed resolution of the question as turning almost entirely on an interpretation of the *Miranda* language quoted above. It considered the 'critical safeguard' identified in the *Miranda* passage to be a person's 'right to cut off questioning.' *Michigan* v. *Mosley, supra* at 103. 'Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting.' *Id.* at 103-104. The Court then concluded, as correctly noted by the judge in the present case, that *Miranda* mandated that the admissibility of any statements obtained after the person in custody has decided to remain silent depended on whether the person's '"right to cut off questioning" was "scrupulously honored."' *Id.* at 104. See *Commonwealth* v. *Dustin*, 373 Mass. 612, 615 (1977) [cert. denied, 435 U.S. 943 (1978)]; *United States* v. *Olof*, 527 F.2d 752, 754 (9th Cir. 1975). In concluding that the defendant's right to cut off questioning *was* scrupulously honored, and, consequently, that his Miranda rights had not been violated, the Court in *Mosley* stressed that, after the defendant initially stated he wished to remain silent, the police had immediately ceased interrogation. Questioning was resumed 'only after the passage of a significant period of time and the provision of a fresh set of warnings,' and the second interrogation was restricted 'to a crime that had not been a subject of the earlier interrogation.' *Id.* at 106."

*Mosley* is clearly distinguishable from this case. Interrogation here was not cut off when the defendant asserted his rights. On the contrary, statements were made by the authorities which were intended to overcome the defendant's

resistance to interrogation, and even the respite of fourteen minutes, unlike the similar interval in *Mosley*, and the permitted discussion with Kampen were aimed at the same purpose. *Rhode Island* v. *Innis, supra*, is also distinguished from this case, in that the Supreme Court there held that a conversation between police officers, although it was overheard by the defendant in that case and may have had a "subtle compulsion" which caused him to make admissions after he had asserted his right to remain silent, was not "interrogation" within the meaning of *Miranda. Id.* at 303. Logic does not permit such a result in the instant case, where the authorities achieved the result (admissions by the defendant) which they hoped and intended from their conduct and words.

The result we reach here is supported by our reasoning in two recent cases. *Commonwealth* v. *Watkins*, 375 Mass. 472 (1978), and *Commonwealth* v. *Taylor*, 374 Mass. 426 (1978). In *Watkins*, the suspect asked for an attorney while being questioned in a Kentucky police station by Massachusetts officers. The questioning continued for some moments but stopped when the suspect said·a second time that he wanted an attorney. The suspect was allowed to call an attorney, but instead called and spoke to his mother and sister. Thereafter he said he was ready to make a statement, and a further incriminating statement was taken. Although the statement before Watkins' telephone call was suppressed, this court affirmed the admissibility of the statements after the call because "the defendant's spontaneous declaration of his desire to make a further statement constituted an implied, if not an express, waiver of his previously asserted desire to speak with counsel . . . ." *Id.* at 484-485.

The facts in the *Taylor* case are readily distinguishable because the police initiated the defendant's admissions by showing him a wanted poster and telling him his fingerprints were found at one crime scene, in an apparent effort to get a statement from him only five minutes after he told the police in his attorney's presence that he did not wish to say anything. *Id.* at 428-429. The instant case is closer in

facts to *Taylor* than to *Watkins*. Although Brant himself sought the interview with Kampen, that is not significant, for the impetus for this request clearly came from the police statements immediately after Brant asserted his right to remain silent.

Implied in the motion judge's findings of fact, and in the Commonwealth's argument, is the premise that Brant may well have been motivated to change his mind and to make his inculpatory statements by his desire to return to Massachusetts for prosecution and thus avoid Florida prosecution and the danger of sexual assaults in prison. We assume such reasoning on his part was possible, but we also have in mind that the burden was on the Commonwealth to establish that the defendant knowingly and intelligently waived his privilege against self-incrimination. *Miranda, supra* at 475. Viewed in light of this burden, it is clear that suggestions of motivations unrelated to the authorities' statements rest in conjecture. Rather we have a case in which the defendant's rights were not scrupulously honored, as required by law. It is also a case where the "cat-out-of-the-bag" aspect became acutely significant when Brant, in the face of his assertion that he wanted his attorney present — an attorney who undoubtedly could have explained the evidentiary significance of Kampen's statement as it related to Brant —, was instead subtly turned toward an inculpatory statement.

Contrary to the Commonwealth's argument, nothing that we have said has the effect of establishing a per se proscription on further questioning after a defendant has once asserted his right to remain silent. Nor, in the circumstances of this case, have we impugned the results or the reasoning in those cases principally relied upon here by the Commonwealth, viz.: *Mosley, supra* and *Watkins, supra*.

2. We discuss the second assignment of error urged by Brant against the possibility that the issue may arise at any new trial of this indictment. Brant asserts that the trial judge erred by allowing the assistant district attorney to argue to the jury that Brant had made no response when his codefendant had made certain statements to law enforce-

ment authorities, and by instructing the jury that they could consider that failure to be an admission on the part of Brant. The Commonwealth argues that Brant had waived his right to remain silent and consequently could not rely on that right. Further, the Commonwealth argues that, if there was error, it was harmless, in view of Brant's detailed admissions in the twenty-page statement in which he and Kampen joined. Assuming that the Commonwealth's arguments would be correct if the twenty-page statement had been admitted, it is also true that when the statement is excluded at any new trial, the silences of Brant during Kampen's recitals will not be admissible evidence or a proper subject of argument. *Doyle* v. *Ohio,* 426 U.S. 610 (1976). *Commonwealth* v. *Grieco,* 5 Mass. App. Ct. 350 (1977). *Commonwealth* v. *Bennett,* 2 Mass. App. Ct. 575, 580 (1974).

3. The twenty-page statement of Brant, and all evidence of admissions by him at the Florida interview, should have been excluded as obtained in violation of his rights under the Fifth Amendment to the Constitution of the United States. Consequently the judgment is reversed, the verdict set aside and the case remanded to the Superior Court for a new trial.

*So ordered.*