James E. HILL, Appellant,

v.

UNITED STATES, Appellee.

No. 02–CF–527.

District of Columbia Court of Appeals.

Argued Jan. 7, 2004.

Decided Aug. 19, 2004.

Eric K. Klein, Public Defender, with whom James Klein and Samia Fam, Public Defenders, were on the brief, for appellant.

John P. Gidez, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Roy W. McLeese III, and Glenn L. Kirschner, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ, REID, and WASHINGTON, Associate Judges.

RUIZ, Associate Judge:

A jury convicted James E. Hill of voluntary manslaughter while armed, as a lesser-included offense of second-degree murder while armed, and related weapons offenses.[1] He principally claims on appeal that the police violated his Fifth Amendment privilege against compulsory self-incrimination by eliciting an incriminating statement from him in the absence of *Miranda*[2] warnings. We agree that the trial court should have suppressed the incriminating statement and therefore reverse his convictions and remand the case for a new trial. We have previously "ad-

---

**1.** *See* D.C.Code §§ 22–2103, –4502 (2001) (second degree murder); *id* § 22–4504(b) (possession of a firearm during a crime of violence or dangerous offense); *id* § 22–4504(a) (carrying a pistol without a license).

**2.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

monished the police in this jurisdiction about 'the obvious impropriety,' as well as the risk to prosecutions, in the 'deliberate failure of the police to inform a criminal suspect *promptly* of his rights under *Miranda.*'" *United States v. Brown,* 737 A.2d 1016, 1021 n. 8 (D.C.1999) (citing *Davis v. United States,* 724 A.2d 1163, 1170 (D.C.1998)). Our decision today sounds this warning again.

## I.

### A. *The Trial*

Early in the evening of October 27, 2001, appellant and his close friend, Corey Bush, had just returned from purchasing a jug of antifreeze at a local store when they discovered that a parking spot had opened near 1475 Euclid Street, N.W., where they intended to visit a friend by the name of Geoffrey Coffie. Bush and Coffie stood on the sidewalk conversing while appellant attempted to re-park Bush's car in the newly available space. Just as appellant was about to parallel park, however, a stranger, Francisco Villegas–Diaz, approached the vehicle and opened the front passenger door, said something unintelligible to appellant, slammed the car door shut, and continued to walk rapidly down the street. Appellant immediately got out of the car and pursued Villegas–Diaz yelling expletives. Bush also gave chase intending "to smoke [Villegas–Diaz] out with the [jug of] antifreeze" because he was angry that Villegas–Diaz had touched his vehicle.

By the time Villegas–Diaz reached the corner of the block, appellant and Bush were "right beside each other" seven to eight feet behind. Bush "was going toward [Villegas–Diaz] with [the] bottle of antifreeze." Villegas–Diaz turned to confront his pursuers and pulled something silver in color from his pocket. He moved forward and backward in a menacing manner and lunged toward appellant and Bush, wielding a seven- or eight-inch knife. Although appellant originally thought the weapon was a gun, the second time Villegas–Diaz lunged forward appellant saw that it was in fact a knife. As Villegas–Diaz sprung for the third time, appellant drew a gun and fired at him—three shots as Villegas–Diaz began to advance and three more times as Villegas–Diaz continued to push forward in "an overhead swimming motion," "like trying to get there to him." After the shots, Villegas–Diaz apparently remained on his feet, but stumbled backwards and began to wander away. Having expended his ammunition, and the confrontation seemingly over, appellant returned to the business of parking Bush's car. Thereafter, appellant, Bush, and Coffie went to Coffie's apartment.[3]

Appellant testified on his own behalf, admitting that he shot the decedent, but claiming that he did so in self-defense. He

---

3. The foregoing account was substantially related by Bush. The government additionally presented the testimony of two other witnesses. Genet Zacharias observed three men on the corner of 15th and Euclid Streets as she drove in her car. Two of the men appeared to be arguing. As she drove away from the intersection, she heard six or seven gunshots, prompting her to look back in time to observe two men turn and run. She immediately returned to the scene to assist the victim and wait for the police.

Meanwhile, Weafue Saab ran to the window of his Howard University dormitory after hearing a gunshot. From this vantage point, he saw a gunman extend his arm toward the chest of a victim who was "cringing" six feet away. Saab stated that "there was no forward movement" by the victim toward the gunman. Saab then heard five to six additional shots in rapid succession and observed the victim begin to stumble backwards. Following the shooting, the gunman parallel-parked a car and disappeared into an apartment building.

explained that he did not shoot until the decedent was advancing toward him and he thought that the decedent intended to stab him. He claimed that he could not walk away for fear that the decedent would strike from behind.

Defense witness Sabrina Hughes, a Howard University student, corroborated appellant's account. She testified that when she heard gunshots from inside her dormitory, she ran to the window and observed a gunman extend his arm toward a victim who was approximately five to six feet away but approaching the gunman. She then heard three more gunshots. The victim continued to advance toward the gunman even as the shots were fired, and seemed to be trying to gather something from the ground. After the last round of gunfire, the gunman and his companion turned the corner and disappeared from sight.

Within several minutes of the shooting, officers with the Metropolitan Police Department found Villegas–Diaz lying on the sidewalk approximately 139 feet from the corner of 15th and Euclid Streets. He was taken to the hospital where he was pronounced dead from gunshot wounds to the left upper chest and arm. The police also quickly found appellant inside Coffie's apartment, where they conducted a pat down search that yielded a .22–caliber revolver in the right front pocket of appellant's jacket.[4]

Having heard the foregoing evidence, the jury indicated after one day of deliberations that it was at an impasse. The trial judge encouraged the jurors to identify areas of agreement and disagreement, and suggested that the court might now allow the jury to consider the lesser-included offense of manslaughter. The jury immediately responded that it was, in fact, already deadlocked with respect to manslaughter, prompting the trial court to give the so-called *Winters* antideadlock instruction.[5] The jurors resumed deliberations the next day and requested a written copy of the instruction. The jury rendered guilty verdicts later that day on the manslaughter while armed and weapons counts.

### B. *The Motion to Suppress*

Appellant moved pre-trial to suppress a statement he gave to the police after he was arrested. Testimony at the suppression hearing established that shortly after the shooting and his arrest, appellant was transported to the third district police station where he was handcuffed to a chair in an interview room. At approximately 10:00 p.m., Detective Lupercio Rivera arrived at the station house and learned that appellant was in custody. He further learned that no one had yet spoken to appellant, and "instructed [that] nobody [is] to advise him of his rights until I do . . . ." At 11:30 p.m.—approximately three and one-half hours after appellant had been taken into custody—Detective Rivera entered the interview room to offer a soda and to allow appellant to remove his sweatshirt because the interview room was hot. He later returned with a beverage, according to the detective's testimony, for the purpose of introducing himself to appellant. He was accompanied by Sergeant

---

4. The revolver was later determined by forensic testing to be the gun that fired two expended rounds or "slugs" recovered from the decedent's body. Based on testing, the firearms examiner opined that the muzzle of the gun "had to be approximately from three to four feet or more away" from the decedent when it was fired.

5. *See Winters v. United States,* 317 A.2d 530, 534 (D.C.1974) (en banc); *see also* Criminal Jury Instructions for the District of Columbia, No. 2.91.

J.D. Manning. As recounted by Detective Rivera, the following exchange occurred before *Miranda* warnings were given:

> [Detective]: I told him [Hill] I'm Lu Rivera, I'm the one running the show and you're going to be charged with murder II.
>
> [Prosecutor]: And at that point, what, if anything, did the defendant do or say?
>
> [Detective]: He asked me, how about my friend? What's up with him?
>
> [Prosecutor]: Did you know ... who [Hill] was referring to?
>
> [Detective]: Yes, sir.
>
> [Prosecutor]: Who?
>
> [Detective]: Corey Bush.
>
> . . .
>
> [Prosecutor]: And had you interacted with Corey Bush prior to coming into that interview room?
>
> [Detective]: Yes, sir.
>
> [Prosecutor]: And had you interviewed Mr. Bush about what had happened at 15th and Euclid earlier that night?
>
> [Detective]: Yes, sir.
>
> [Prosecutor]: And did he tell you?
>
> [Detective]: Yes, sir.
>
> [Prosecutor]: When Mr. Hill asked you about my friend, what did you say?
>
> [Detective]: I said he's okay. Then he asked me, is he locked up?
>
> . . .
>
> [Prosecutor]: And what did you say in response to that question?
>
> [Detective]: I said no, *but let me tell you he told us what happened.*
>
> . . .
>
> [Prosecutor]: What happened after you made that statement?
>
> [Detective]: It was a brief silence and then Mr. Hill looked at me and then

> he said, no, I'm going to tell you what happened.
>
> [Prosecutor]: How brief a silence, seconds, minutes?
>
> [Detective]: Ten seconds, 15 seconds.
>
> [Prosecutor]: And his words were?
>
> [Detective]: No, I'm going to tell you what happened.
>
> . . .
>
> [H]e proceeded to tell me that he was driving the vehicle. He was trying to park. Some Spanish guy opened the door. They got into an argument. He got out of the car, meaning Mr. Hill, approached the Spanish guy and the Spanish guy started reaching into his waistband. There was something shiny, something silver in his waistband, and then that's when he shot the guy, parked the car and went into the apartment.
>
> . . .
>
> [Prosecutor]: About how long did that narrative last? How long did he speak?
>
> [Detective]: Two minutes, two minutes, 15 seconds, something like that.
>
> . . .
>
> [Prosecutor]: What happened when he stopped speaking?
>
> [Detective]: There was silence in the room. I didn't say anything and Sergeant Manning didn't say anything. There was silence for about 20 seconds and then somebody knocked on the door ... and then I left the room.

Appellant was advised of his rights at 1:30 a.m., whereupon he asked for an attorney.

The trial court denied the motion to suppress appellant's statement to the police, concluding that Detective Rivera's comments did not constitute the functional equivalent of express questioning.[6] As the court reasoned,

---

**6.** The court also found that it was "clear that Mr. Hill was in custody." The government

there is case law that looks at whether there is the functional equivalent of interrogation, and I believe the case you cited, that maybe the *Innis* case, *Rhode Island versus Innis*, where you talked about the police making comments to the defendant about wanting the missing child to have a decent [C]hristian burial. I believe those comments were much more designed and intended to put pressure on a suspect to make an incriminating statement, and the statement that the detective added beyond responding to the immediate question that the defendant asked. The detective answered the questions the defendant was asking and added the statement, no, but he told us what happened. The fact that the detective may have hoped that the defendant would say something beyond that, I don't think is enough to translate that into the functional equivalent of interrogation. So there was no interrogation or the functional equivalent of interrogation, so there was no requirement to give him *Miranda* rights as a condition to the admission of the statements, so the motion to suppress the statements is denied.[7]

## II.

### A. *The Miranda Violation*

▮▮▮ The government is constitutionally precluded by the Fifth Amendment's Self–Incrimination Clause from using at trial a defendant's incriminating statement made while in custody unless the defendant has been advised of his right to remain silent (as a means of safeguarding the privilege against compulsory self-incrimination) and to be represented by an attorney before he is interrogated.[8] *See Miranda*, 384 U.S. at 442, 86 S.Ct. 1602; *Dickerson v. United States*, 530 U.S. 428, 442, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). The burden is on the government to prove that the unwarned statement of a suspect in custody was voluntarily given without police coercion. *See Martin v. United States*, 567 A.2d 896, 907 (D.C. 1989) (citing, *inter alia*, *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972)). Of course, not all statements obtained by the police after a suspect has been taken into custody are necessarily the product of coercion. "Any statement given freely and voluntarily without any compelling influences is … admissible in evidence." *Miranda*, 384 U.S. at 478, 86 S.Ct. 1602. A "compelling influence," moreover, need not take the form of express questioning by the police. Rather, the notion of interrogation in *Miranda* broadly comprises both express questioning and "any words or actions on the part of the police—other than those normally attendant to arrest and custody—that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301, 100 S.Ct. 1682 (footnotes omitted). In ascertaining whether an incriminating statement is the result of a compelling police influence, the focus is "primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.*; *see also Stewart v. United States*, 668 A.2d 857, 865–66 (D.C.1995).

---

does not challenge this finding on appeal and we similarly see no reason to disturb it.

7. The court was referring to the facts of *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), rather than *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

8. A statement is deemed to be "incriminating" for purposes of Fifth Amendment analysis, "whether inculpatory or exculpatory," if it is one "that the *prosecution* may seek to introduce at trial." *Innis*, 446 U.S. at 301 n. 5, 100 S.Ct. 1682 (citing *Miranda*, 384 U.S. at 476–77, 86 S.Ct. 1602).

To ward against unexpected perceptions, however, we evaluate the normally foreseeable effect of the officer's remark or conduct, keeping in mind any peculiar susceptibilities of the suspect then known to the police.[9] *Innis,* 446 U.S. at 301, 100 S.Ct. 1682; *Hawkins v. United States,* 461 A.2d 1025, 1030 (D.C.1983). Though the test focuses on the suspect's perceptions, "where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." *Innis,* 446 U.S. at 301 n. 7, 100 S.Ct. 1682.

■ In this case, the trial court denied the motion to suppress appellant's statement on the ground that Detective Rivera's response to appellant, "no, but let me tell you he told us what happened," was not the functional equivalent of interrogation. Specifically, the trial court considered that the detective's comment did not evince a degree of compulsion similar to the "Christian burial speech" found to be coercive in *Brewer,* 430 U.S. at 392–93, 97 S.Ct. 1232. We review the denial of a motion to suppress statements for *Miranda* violations with deference to the trial court's findings of evidentiary fact. *See Jones v. United States,* 779 A.2d 277, 281 (D.C.2001) (en banc) (citing *In re E.A.H.,* 612 A.2d 836, 838 (D.C.1992)). However, whether "on the duly established facts, [appellant] was subjected to custodial interrogation without the benefit of *Miranda* warnings is a question of law," which we review *de novo. Id.* (quoting *Reid v. United States,* 581 A.2d 359, 363 (D.C.1990)). Applying these principles, we conclude that the court's sole reliance on *Brewer*

was mistaken and that the detective's comment was the functional equivalent of interrogation under *Innis.*

■ *Brewer* is a Sixth Amendment case falling outside the jurisprudence that informs the meaning of "interrogation" under the Fifth Amendment and *Miranda. See Innis,* 446 U.S. at 300 n. 4, 100 S.Ct. 1682 ("The definitions of 'interrogation' under the Fifth and Sixth Amendments, if indeed the term 'interrogation' is even apt in the Sixth Amendment context, are not necessarily interchangeable, since the policies underlying the two constitutional protections are quite distinct."); *see also Stewart,* 668 A.2d at 866 n. 8. Under the Sixth Amendment, which guarantees the right to counsel, the government may not "deliberately elicit" an incriminating response from a person formally charged with a crime in the absence of the accused's lawyer. *See Massiah v. United States,* 377 U.S. 201, 205–06, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). For Sixth Amendment purposes, therefore, the focus is on the police officer's action and intent, not on an objective evaluation of the police actions' effect on the suspect that is relevant under the Fifth Amendment. Although *Brewer* was discussed in the *Innis* decision, it was dismissed as inapposite by the majority, *see Innis,* 446 U.S. at 300 n. 4, 100 S.Ct. 1682, and its relevance to Justice Stevens's dissent was dependent on the particular facts surrounding Innis's interrogation. Under Justice Stevens interpretation of the record,

> [a]lthough [Innis's claim] involves Fifth Amendment rights and the *Miranda* rules designed to safeguard those rights,

---

9. During the suppression hearing, Detective Rivera testified that appellant appeared calm and did not signal that he was confused in any way. Appellant does not specifically argue on appeal that he suffered from any particular susceptibilities known to the police at the time of questioning, apart from the vulnerability inherent to being held incommunicado for three and one-half hours before speaking with anyone.

[Innis's] invocation of his right to counsel makes the two cases indistinguishable. In both cases the police had an unqualified obligation to refrain from trying to elicit a response from the suspect in the absence of his attorney.

*Id.* at 310 n. 7, 100 S.Ct. 1682 (Stevens, J., dissenting). In this case, unlike Innis, appellant did not invoke his Sixth Amendment right to counsel before making the incriminating statement.[10] Thus, whether Detective Rivera's words fell below the degree of deliberate elicitation deemed sufficient in *Brewer* to constitute a Sixth Amendment violation does not address the question of whether there was the functional equivalent of interrogation—as viewed from the suspect's perspective—that would implicate the Fifth Amendment.

 Applying the Fifth Amendment's focus on the reasonably foreseeable perceptions of the suspect, appellant contends that Detective Rivera should have known that the "combination of telling [him] that he was being charged with second-degree murder and that Corey Bush 'told [the police] what happened' " would likely elicit an incriminating response, such that the detective's words were the functional equivalent of express questioning requiring *Miranda* warnings under *Innis,* 446 U.S. at 300–01, 100 S.Ct. 1682. The government responds by arguing that merely confronting a suspect with the fact that a cohort has given a statement, as opposed to relating its inculpatory content, is not an impermissible ploy nor designed to elicit a response and, therefore, does not constitute the functional equivalent of express questioning. We agree with appellant. Although this case is somewhat unique in that appellant was confronted only with the bare fact that Bush had given a state-ment to the police without being told expressly that he had inculpated appellant, several considerations suggest that Detective Rivera should have known that under the circumstances his words were likely to elicit an incriminating response from appellant.

First, Detective Rivera's words sufficiently posited appellant's guilt in contravention of the Supreme Court's admonitions against such tactics. *See Miranda,* 384 U.S. at 455–56, 86 S.Ct. 1602; *Innis,* 446 U.S. at 299, 100 S.Ct. 1682. From the perspective of a reasonable observer in the circumstances of appellant's custody, *see Hawkins,* 461 A.2d at 1030 n. 8—specifically, three and one-half hours of sitting handcuffed in a station house interview room—the detective's comment that Bush had told them "what happened" had the effect of conveying to appellant that the police possessed evidence of his guilt. Appellant discovered through Detective Rivera that Bush was not being detained after having made his statement to the police, all the while remaining in custody himself. The obvious implication was that Bush had provided information that simultaneously liberated Bush from being subjected to further detention and questioning while turning the focus of the police investigation on appellant.

Second, the unresponsive and postured nature of Detective Rivera's words is suggestive of a purposeful design likely to elicit an incriminating response. *See Innis,* 446 U.S. at 301 n. 7, 100 S.Ct. 1682 (explaining that where the practice is designed to elicit an incriminating response, it is unlikely that the practice will not also be one that the police should have known was reasonably likely to do so). The statement, "he told us what happened," was not

10. As noted earlier, appellant did invoke the right to counsel immediately upon receiving *Miranda* warnings, which occurred after he had already given his statement.

responsive to appellant's preceding question asking whether Bush had been detained. As the trial court noted, Detective Rivera "answered the questions the defendant was asking *and added the statement,* ... he told us what happened." The introductory emphasis, "but let me tell you," also indicates deliberation in making the remark. We believe the seemingly calculated nature of the detective's remark is persuasive evidence of a designed practice, unlikely to be one that the detective could not have known would reasonably prompt an incriminating response from appellant.

Any remaining doubt about the designed nature and likely effect of Detective Rivera's words is eliminated by our third consideration, namely, the context surrounding the remark. The tripartite approach evident here combines classic interrogation techniques in which the interrogator (1) establishes authority ("I'm running the show and you are going to be charged with murder II"), (2) confronts the suspect with evidence against him ("but let me tell you, he told us what happened"), and (3) creates a verbal vacuum (ten to fifteen seconds of silence) in which the first person to break the silence constitutes the losing party. *See* FRED INBAU & JOHN REID, ET AL., CRIMINAL INTERROGATIONS AND CONFESSIONS 213–22 (4th ed. 2001), *cited with approval in Miranda,* 384 U.S. at 449–55, 86 S.Ct. 1602 (referring extensively to the 1962 edition). This multifaceted approach, facilitated by Detective Rivera's admonition that "[n]obody [is] to advise him of his rights until I do," produced exactly its intended result in this case.

In *United States v. Alexander,* 428 A.2d 42 (D.C.1981), a suspect in custody asserted her Fifth Amendment right to remain silent in the absence of counsel, after which the interviewing detective stated, "we know what happened," or "we know you are responsible for the stabbing."[11] *Id.* at 45. We held that in making that comment the officer had continued to interrogate the suspect despite her invocation of Fifth Amendment protections and, therefore, her rights were not "scrupulously honored" as required by *Michigan v. Mosley,* 423 U.S. 96, 102, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). *See Alexander,* 428 A.2d at 51. We explained that the officer's remark, "in light of *Innis,* [is] contrary to the [trial] court's conclusion that nothing done by the detective constituted interrogation." *Id.* We additionally cited the detective's testimony during the suppression hearing that he subjectively intended to make her talk as "buttressing" the conclusion that the suspect's rights had not been scrupulously honored, but noted that "[e]ven without the admission by [the detective], the events suggest[ed] those coercive circumstances prohibited by *Miranda.*" *Id.* Although *Alexander* focused on whether the police had scrupulously honored the suspect's assertion of her Fifth Amendment rights after *Miranda* warnings had been given, the court's analysis of whether interrogation had occurred under *Innis* is equally applicable to our present inquiry into whether there was interrogation such that *Miranda* warnings should have first been given. If the statement by the detective in *Alexander,* "we know what happened," constitutes interrogation, *a fortiori,* the facts here also constitute interrogation since Detective Rivera's words more forcefully suggested that Bush—a person appellant knew had firsthand knowledge—had supplied information inculpating him to the police.[12]

---

**11.** The opinion simultaneously credits both remarks as the detective's actual words.

**12.** A decision by the Supreme Judicial Court of Massachusetts also is instructive. In *Commonwealth v. Brant,* 380 Mass. 876, 406 N.E.2d 1021 (1980), Brant was brought into

This case may be distinguished, moreover, from prior decisions of this court that have affirmed the admission of incriminating custodial statements. In *Hawkins,* 461 A.2d at 1027, the suspect invoked his right to silence after having received *Miranda* warnings. The homicide detective then left the interview room, and a police sergeant entered to

> introduce[ ] himself to [the suspect], and told [the suspect] he was going to "process" him. At that point, [the sergeant] also told [the suspect] that "he was here on a charge of homicide in reference to a shooting that had occurred on the prior date at 9:30 p.m., and that *an investigation revealed that he was responsible.*" [The sergeant] then began to type one of the police reports.
>
> Within just minutes, . . . [the suspect] stated that "he had been thinking it over and he decided that he wanted to get it off his chest." [The suspect] was then advised of his *Miranda* rights a third time; and he signed a waiver of his rights on another PD 47 card.

*Id.* (italicized text indicates challenged remark). We concluded that the invocation of the privilege against self-incrimination had been scrupulously honored and that the statements were not the product of interrogation, *see id.* at 1028, reasoning that the sergeant's words were consistent with his stated intention to "process" the suspect. *See id.* at 1029. The court noted first that the words "an investigation revealed" "might well be viewed as less threatening than the statement 'we know' " made in *Alexander* and, second, that an officer other than the one who actually observed the suspect assert his rights had made the challenged remark. *Id.*; *see also id.* at 1031 (designating by reference all the factors that distinguish *Alexander* as providing a basis for the conclusion that the sergeant's remarks did not constitute the functional equivalent of express questioning). In contrast to the sergeant's comment made in the course of administrative processing in *Hawkins,* Detective Rivera's statement here, "let me tell you he told us what happened," cannot plausibly be considered incidental to Detective Rivera's stated purpose of introducing himself.[13] Indeed, none of the factors used by the court to distinguish *Alexander* is present here. The comment "he told us what happened" clearly could be viewed as

---

an interview room together with another person suspected of the same crime, whereupon he refused to answer any questions in the absence of counsel. *See id.* at 1024. One of several officers in the room "then interjected the fact that [the other suspect] had already made a statement to the police," which another officer in the room also confirmed. *Id.* Brant then requested a private conference with the other suspect. *See id.* After fourteen minutes of private discussion, Brant "stated his willingness to proceed without an attorney present to represent him and . . . made his inculpatory statements." *Id.* at 1026. The court found that Brant was interrogated under *Miranda*. *See id.* at 1026–27. Although *Brant* involved a confrontation with another suspect not present here, the court's focus was on the remarks made by the police which precipitated the request for a private conference: "statements were made by the

authorities which were intended to overcome the [suspect's] resistance to interrogation, and even the respite of fourteen minutes . . . and the permitted discussion with [the other suspect] were aimed at the same purpose." *Id.* at 1027 (reasoning that "the impetus for this request [to confer with the other suspect] clearly came from police statements immediately after Brant asserted his right to remain silent"). As in *Brant,* Detective Rivera's decision to furnish the fact that Bush had made a statement was "intended to overcome . . . resistance to interrogation" in violation of *Miranda*. *Id.*

13. Nor does the record reveal why Detective Rivera's stated purpose simply to introduce himself required Sergeant Manning's presence.

more threatening than the statement "we know" in *Alexander* because, as discussed above, it suggests that the government had a witness willing to speak to his first-hand knowledge. Likewise, the same officers who failed to advise appellant of his *Miranda* rights also made the challenged remark. Furthermore, Detective Rivera's revelation that Bush had made a statement followed by the lapse of ten to fifteen seconds of silence cannot be construed as actions "normally attendant to arrest and custody." *Innis*, 446 U.S. at 301, 100 S.Ct. 1682. According to Detective Rivera's testimony, neither he nor Sergeant Manning carried any item relevant to processing appellant into the interview room. Thus, neither Detective Rivera's revelation nor the silence that followed appears to have been prompted by the need to process paperwork or handle other routine administrative matters. *Cf. Hawkins*, 461 A.2d at 1029 (crediting officer's testimony that his purpose in stating, "an investigation revealed that [you] are responsible," was purely administrative). Instead, the evidence supports the conclusion that the detective added the comment about Bush's statement and sat in needless silence for ten to fifteen seconds, hoping to prompt an incriminatory response. As the Supreme Court has recognized, silence in the face of an accusation creates an inference of guilt and therefore acts as a powerful inducement on the accused to speak "either for fear that his failure to make answer would be considered against him, or of hope that if he did reply he would be benefited thereby." *Bram v. United States*, 168 U.S. 532, 563–64, 18 S.Ct. 183, 42 L.Ed. 568 (1897); *see also Robinson v. United States*, 606 A.2d 1368, 1371 (D.C.1992) (discussing standard for adoptive admission by silence of a codefendant's statement).

Also distinguishable is *Brown*, in which a detective formally introduced himself fifteen to twenty minutes after the suspect's arrival in an interview room. Without having first given *Miranda* warnings, the detective told the suspect that he

> was "under arrest in connection with the death of a Mr. Bernard Brown." Then, according to [the detective], "without any reason or ... any provocation," [the suspect] "just came out and said 'Oh, I heard about this, you know, they are trying to put that beef on me,' " adding that " 'I don't even know that boy' " and " '[I] wasn't even out there when this occurred.' " [The detective] again testified that "the moment ... I explained to him that it was in reference to Bernard Brown, he spurted that out," "just sputtered [and] went on with it," denying that he knew the victim or was "even out there." [The detective] "immediately stopped" [the suspect] at that point, saying "you need to stop. I need to read you your rights. You have that right." [The suspect] was then read his *Miranda* rights, and indicated on the rights card that he did not want to speak further without an attorney present.

737 A.2d at 1017. We reversed the trial court's decision to suppress the statement, concluding that the detective's words, while "striking a responsive chord, did not rise above the 'subtle compulsion' inherent in arrest which the *Innis* Court refused to equate with interrogation." *Id.* at 1020 (citation omitted). In arriving at this conclusion, we reasoned that

> [the suspect] was not held incommunicado for long before [the detective] introduced himself. And the police did not "carr[y] on a lengthy harangue in [his] presence," did not expressly ask him anything, did not even hint at the nature or strength of the evidence against him, did not give him false or minimizing information about his plight, and did not even hold a "conversation" with him— "the first preparatory step of [a detec-

tive] experienced in conducting investigations," They did none of these things before he "just came out," in [the detective's] words, and denied being at the scene of the killing or knowing the victim.

*Id.* at 1020–21 (internal citations omitted). The present case is quite different. Appellant was held incommunicado, handcuffed to a chair in an interview room for approximately three and one-half hours before Detective Rivera spoke with him. Detective Rivera's remark that Bush had told police what happened was made within the context of a conversation with appellant and strongly hinted, if only by implication, that evidence against appellant was mounting. Furthermore, it cannot be said that appellant "just came out" with his statement when it followed ten to fifteen seconds of expectant silence after the detective's remark, and was introduced in a manner that clearly indicates that appellant was responding to the news that Bush had been freed as a result of the statement he gave to the police. Rather than blurting his own unbidden account, appellant broached his statement with contradistinction: *"No, I'm* going to tell you what happened." The phrasing of appellant's introduction reflects that he was prompted by the news that Bush had made a statement and the significance—pondered over the course of ten to fifteen seconds—that Bush's statement potentially held for his on-going custody. On these facts, it cannot be said that appellant "freely" and "voluntarily" offered his statement "without compelling influences." *See Miranda,* 384 U.S. at 478, 86 S.Ct. 1602.

We are convinced that "the seemingly benign transmittal of information to [appellant] . . . resembles the kind of mental games that largely generated the *Miranda* decision itself." *Brown,* 737 A.2d at 1021 (citing *Innis,* 446 U.S. at 299, 100 S.Ct. 1682). The detective's instruction that

"[n]obody [is] to advise him of his rights until I do" underscores the plan to intimidate appellant by purposely withholding the advisement of rights meant to counteract the pressure inherent in custodial interrogation required by the Supreme Court in *Miranda.* This is not to be countenanced for, as the Supreme Court has recently emphasized in an analogous context, "[s]trategists dedicated to draining the substance out of *Miranda* cannot accomplish by training instructions what *Dickerson* held Congress could not do by statute." *Missouri v. Seibert,* —— U.S. ——, 124 S.Ct. 2601, 2613, 159 L.Ed.2d 643, 2004 U.S. Lexis 4578, *31 (June 28, 2004) (holding that police technique of eliciting an initial unwarned confession followed by a second warned statement violates *Miranda* ). Appellant's statement was the coerced product of the functional equivalent of express questioning and, therefore, should have been suppressed because it was made in the absence of *Miranda* warnings.

### B. *Constitutional Harm*

■ Having found a *Miranda* violation, we must now determine whether the trial court's denial of the motion to suppress the statement constitutes reversible constitutional error. *See, e.g., Stewart,* 668 A.2d at 868 (applying *Chapman v. California,* 386 U.S. 18, 20, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) to the erroneous admission of inculpatory statements violating *Miranda*). If there is no "reasonable possibility" that the offending evidence might have contributed to the conviction, the error is harmless beyond a reasonable doubt. *Chapman,* 386 U.S. at 23, 87 S.Ct. 824. Stated differently, the erroneous admission into evidence of an illegally obtained confession is harmless beyond a reasonable doubt when "there remains overwhelming evidence to support the jury's verdict."

*Smith v. United States,* 529 A.2d 312, 318 (D.C.1987) (citing *Derrington v. United States,* 488 A.2d 1314, 1331 & n. 25 (D.C. 1985)).

Applying these principles, we cannot conclude that the error of admitting appellant's statement was harmless beyond a reasonable doubt.[14] The government's case depended on the testimony of Bush, Zacharias, and Saab.[15] See note 3, *supra.* Of these, only Saab's testimony clearly rebutted appellant's claim that he shot the decedent in self-defense as he continued to threaten appellant. Saab's account, however, was substantially contradicted by both Bush's and Hughes's testimony, who, in contrast to Saab, saw no retreat by the decedent in the moments

before the shooting, but rather, a herculean advance upon appellant even after the first volley of three shots. See note 3 and corresponding text, and page ——, *supra.* Thus, to discredit appellant's self-defense claim, the government necessarily relied on appellant's incriminating statement to the police, which was a focal point of the prosecution: it was presaged in the government's opening statement; it was introduced into evidence at the very end of the government's case-in-chief through Detective Rivera's testimony; it was used to challenge appellant's claims of self-defense during his cross-examination; and it was showcased in the government's closing argument. A recurrent prosecution theme was that appellant's confession to the police belied any claim to self-defense, either

14. As the beneficiary of a constitutional error, the government bears the burden of proving beyond a reasonable doubt that the erroneously admitted statement did not contribute to appellant's conviction. *See Chapman,* 386 U.S. at 24, 87 S.Ct. 824. The government also bears the burden of establishing that appellant's decision to testify did not emanate from the admission of his illegally-obtained statement. *See Smith,* 529 A.2d at 318. The government in its brief relied exclusively on the contention that the trial court did not err, and did not argue in the alternative that appellant's claim should be rejected because any ascertained error was harmless. The government attempted to bridge this analytical gap by raising harmlessness for the first time at oral argument. The government's failure to brief the issue implicitly concedes that it did not, in fact, view admission of the statement, if erroneous, to be harmless. We do not rely on this implied concession but, as discussed in the text, conclude that the constitutional error was not harmless based on our review of the evidence at trial.

15. In this case, the independent evidence of guilt does not embrace appellant's own trial testimony. The evidence tainted by a *Miranda* violation may consist not only of the illegally-obtained statement, but, in some cases, the defendant's trial testimony as well. If a defendant testified "in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then [the]

testimony was tainted by the same illegality that rendered the confessions themselves inadmissible." *Harrison v. United States,* 392 U.S. 219, 223, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968) (footnote omitted). "Such tainted testimony, 'cannot be considered as independent evidence of guilt for purposes of applying the harmless error rule.' " *Smith,* 529 A.2d at 318 (citations omitted). Under the circumstances, we believe the government's use of the illegally-obtained statement tainted appellant's testimony at trial. Appellant's statement to the police, which did not specifically mention a knife, seriously undercut his claim to self-defense, the damaging impact of which he could offset only by testifying. The precise sequence of events relevant to his defense and his statement to the police were uniquely within his knowledge—that, although he did see a shiny object in the decedent's waistband, it was not until the decedent lunged toward him the second time that he realized the object was a knife, and that, although he did not refer specifically to self-defense in his statement to Detective Rivera, he did not shoot until he believed that the decedent intended to stab him. Appellant attempted to show the jury in the only manner available to him that his statement to the police was not inconsistent with his claim of self-defense, but merely an incomplete recitation of facts giving rise to it.

because appellant did not raise it specifically at the time, or because appellant's vague reference to a "shiny object"—as opposed to the knife, which appellant conceded at trial was the weapon the decedent brandished—was a deliberate attempt to lay the groundwork for what the prosecution theorized was appellant's early plan to fabricate a claim of self-defense. That the jurors were quickly deadlocked on the lesser-included charge of manslaughter confirms the critical role that these arguments, and the statement upon which they relied, likely played in the jury's verdict. Given the centrality of appellant's unwarned statement to the government's case, and the evident difficulty the jury had in reaching its verdict, we cannot conclude that the statement's admission was harmless beyond a reasonable doubt.

In the absence of overwhelming independent evidence supporting the jury's verdict, there is a reasonable possibility that the conviction was tainted by appellant's illegally-obtained incriminating statement. We accordingly reverse the judgments of conviction and remand the case for a new trial.

## III.

Appellant contends that his convictions must be reversed on the additional grounds that (1) the trial court's jury instruction on the law regarding a first aggressor's abdication of the right of self-defense was erroneously given in the absence of a factual predicate in the evidence; (2) the trial court erred by allowing the prosecutor to (a) mischaracterize both the evidence and the law of self-defense and (b) inflame the passions of the jury through use of a post-mortem photograph of the decedent; and (3) the trial court erred by failing to conduct a *Jencks*[16] inquiry. Although we do not rest our disposition on the resolution of these claims, the *Jencks* matter is likely to arise again in subsequent proceedings and is therefore relevant to our decision to remand the case.[17]

---

16. See *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957).

17. In light of our holding, we need not address the claims related to the prosecutor's argument and use of the decedent's photograph. We deal summarily with the claim of instructional error, which also could resurface in a new trial.

The trial judge instructed the jury on a range of matters related to self-defense, including paragraph A (where defendant or complainant might have been aggressor) and B (mere words not provocation) of Criminal Jury Instructions for the District of Columbia, No. 5.16 (where defendant might have been the aggressor). Appellant argues that the court's decision to give these instructions constitutes reversible error because they were not fairly supported by the evidence. Specifically, he contends that the decedent was the first person to brandish a weapon, that there's no testimony that the defendant was the aggressor, and that the "judge had no basis to attribute Corey Bush's actions and thoughts to [him]." The government responds by arguing that a reasonable juror could find that appellant had been the first aggressor based on evidence that (1) the decedent was "walking away" before appellant and Bush began pursuing him, and (2) Bush, with whom appellant could be associated because he was "right beside" Bush in similar pursuit of the decedent, was "about to swing" a jug of antifreeze at the decedent's head when the decedent brandished the knife. Thus, argues the government, appellant and Bush were working in concert, and the actions of both are therefore relevant to the issue of who was the first aggressor.

It is an open question in this jurisdiction whether the government's concert-of-action theory, specifically, the attribution of Bush's conduct to appellant, is sufficient under the law to strip a defendant of the right to self-defense. See *People v. Manzanares*, 942 P.2d 1235, 1241 (Colo.Ct.App.1996) (stating that "one cannot acquire the status of initial aggressor by association") (citing *People v. Beasley*, 778 P.2d 304, 306 (Colo.Ct.App.1989)).

Bush testified on cross-examination that he spoke to an officer at the third district police station who appeared to be writing as Bush was speaking. Bush could not recall, however, the officer's name—although he thought it might have been Sergeant Manning—nor did he actually read what the officer wrote. Defense counsel argued that she had laid the foundation for a *Jencks* [18] inquiry to determine whether the officer had written a contemporaneous and substantially verbatim account of what Bush said at the station house. The trial court disagreed, reasoning that Bush was not aware of the identity of the writer nor was there any way to know whether the purported notes captured anything Bush said since he did not see them. Upon further questioning by the court, the prosecutor indicated that, to his knowledge, it was Detective Tabron who had interviewed Bush, that Detective Tabron did not have any notes of the interview, and that the videotape of Bush's later interview, as well as handwritten notes of other officers, had already been turned over to appellant's counsel.

The Jencks Act provides that "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant,

order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b) (1994); *see also* Super. Ct. Crim. R. 26.2(a). The term "statement" means, *inter alia,* "a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement ...." 18 U.S.C. § 3500(e)(2). "[T]o establish entitlement to an inquiry on whether such notes are discoverable as Jencks Act statements ..., counsel need elicit only that the witness was interviewed by an agent of the government, who made notes of the conversation." *Johnson v. United States,* 800 A.2d 696, 700 (D.C.2002) (quoting *United States v. Jackson,* 450 A.2d 419, 425 (D.C.1982)). The defense need not establish that the statements requested are substantially verbatim recitals within the meaning of the Jencks Act. *See id.* at 699–700. Once the apparent existence of the notes is established by the witness's testimony and defense counsel has moved for production, the trial court is under " 'an affirmative

---

Assuming, for the sake of argument, that our jurisprudence comprehends such a principle, there is a question as to whether the facts presented at trial fall within its ambit. The government concedes there is no evidence in the record that Bush verbally communicated to appellant his intent to hit the decedent with the jug of antifreeze. And there is scant evidence from which the jury reasonably could infer that Bush's intent would have been communicated through plainly evident aggressive conduct. Should the instructional issue arise in a retrial, the court should consider whether the evidence adduced on remand comports with the provocation theory of the loss of self-defense, or whether, given the reactive nature of appellant's conduct and the short time frame between the decedent's initial, aggres-

sive act of opening the door of appellant's car and appellant's defensive shooting, a jury would have a reasonable doubt as to whether appellant deliberately put himself in harm's way. *See, e.g., Swann v. United States,* 648 A.2d 928, 933 (D.C.1994) ("[S]elf-defense may not be claimed by one who ... provoked the conflict upon himself/herself.") (internal quotation marks omitted) (citing Criminal Jury Instructions for the District of Columbia, No. 5.16; *Rowe v. United States,* 125 U.S.App. D.C. 218, 219, 370 F.2d 240, 241 (1966) (per curiam) (quoting *Laney v. United States,* 54 App. D.C. 56, 58, 294 F. 412, 414 (1923)); *Nowlin v. United States,* 382 A.2d 9, 14 n. 7 (D.C.1978)).

**18.** *See Jencks,* 353 U.S. at 657, 77 S.Ct. 1007.

duty, either by interrogation or by *in camera* inspection, to ascertain whether' the notes were a Jencks Act statement in the government's possession." *Id.* at 700 (quoting *Bayer v. United States,* 651 A.2d 308, 311 (D.C.1994) (internal quotation marks and citation omitted)).

Appellant maintains that the trial court erred by failing to order the government to search for and produce the alleged notes. The government responds by arguing that "[a]lthough not explicitly spelled out in the court's subsequent discussion with counsel, it is clear that [the trial judge] concluded that there were no ... notes." We disagree with the government's assertion that a finding with respect to the notes' existence may be inferred from the record. To the contrary, the trial court ended the discussion of the matter by instructing the prosecutor to "[p]lease let [defense counsel] know if something does exist so the record can be complete." There is nothing further in the record with respect to the notes. Perhaps by its silence, the government intended to convey that it had made the necessary inquiry and found nothing to report to defense counsel. But because appellant laid a sufficient foundation to trigger an inquiry, on remand the trial court should make explicit findings and, if necessary, conduct a comprehensive evidentiary hearing. Although the trial court may fulfill its affirmative duty under *Jencks* by interrogating government authorities, *see Johnson,* 800 A.2d at 700, "[t]he prosecutor's lack of awareness of any notes [does] not establish they [do] not exist or could not be found." *Id.* at 701 (citing *Flores v. United States,* 698 A.2d 474, 481 (D.C.1997) (agreeing that "the trial court has a duty to conduct an independent inquiry into the existence of *Jencks* material once a witness testifies that an officer took notes of a statement,"

even though prosecutor informed the court that the government's file indicated that the officer had denied having any notes)). Rather, a more searching inquiry is required:

> If the government is not able to produce the notes for inspection, the court must ... determine whether the notes ever existed in the first place and, if they did, the nature and potential importance of the notes and the circumstances surrounding their loss or destruction. The court then will be in a position to decide, in the exercise of its informed discretion, whether ... the government violated its "duty of preservation."

*Id.* (citing *Montgomery v. United States,* 384 A.2d 655, 662 (D.C.1978) (indicating that the court should consider the totality of the circumstances, including the government's bad faith or negligence, when determining, in its discretion, the appropriate sanction to be imposed for a violation of the preservation rule)).

## IV.

The judgments of conviction are hereby reversed and the case remanded for a new trial and express findings on, and, if necessary, an evidentiary hearing into, the possible existence of *Jencks* statements.

*So ordered.*