*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-CF-238

THOMAS DODSON, JR., APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2015-CF1-012486)

(Hon. Rhonda Reid Winston, Trial Judge)

(Argued December 13, 2017                          Decided February 9, 2023)

*William Collins*, Public Defender Service, with whom *Samia Fam* and *Alice Wang*, Public Defender Service, were on the brief, for appellant.

*Michael E. McGovern*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, *Elana Suttenberg*, and *Ryan Creighton*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH, *Associate Judge*, and WASHINGTON and FISHER,* *Senior Judges*.

---

* Judge Fisher was an Associate Judge of the court at the time of oral argument. His status changed to Senior Judge on August 23, 2020. Senior Judge Nebeker was a member of the division at the time of oral argument. Following Judge Nebeker's retirement in December 2020, Senior Judge Washington was selected to replace him.

Opinion for the Court by *Senior Judge* FISHER.

Dissenting opinion by *Associate Judge* BECKWITH at page 22.

FISHER, *Senior Judge*:  At his trial on charges of second-degree child sexual abuse and third-degree sexual abuse (both with aggravating circumstances), appellant Thomas Dodson Jr. argued that nine-year-old H.B.'s allegations were not credible because they were influenced by her fear of her hot-tempered father, John Bush.  Appellant contends on appeal that trial court rulings limiting cross-examination of the father and excluding certain extrinsic evidence of his past behavior violated appellant's Sixth Amendment rights to confront his accusers and to present a complete defense.  We reject appellant's arguments and affirm.

## I.   The Factual and Procedural Background

### A.  The Evidence

Appellant Dodson lived in a house with members of his extended family, including his niece Virginia Dodson and his nephew David Dodson.  Virginia and her boyfriend, John Bush, slept in a bedroom on the second floor.  Many other relatives, including their nine-year-old daughter, H.B., slept elsewhere within the home.  The adult occupants of the house had a rule that nobody was supposed to be

in anyone else's room "without them being there." Appellant Dodson, who is H.B.'s great uncle, slept on a couch in the living room. At trial, family members referred to appellant by his nickname, "Jupe."

H.B. testified that on July 6, 2015, she was in her parents' bedroom watching "Criminal Minds" — a television show she watched regularly. (On cross-examination, H.B. acknowledged that the show deals with "people who do bad things," including "[b]ad sexual stuff . . . [t]hings like rape.") H.B. said that she went downstairs to get a glass of water and saw appellant on the couch. Her mother, her father, and her uncle Dave were on the front porch. After she returned to the bedroom, appellant came into the room, "pushed [her] on her mother['s] bed," and "laid on top of [her]." According to H.B., appellant moved "up and down" on her with the front of his body; she circled her "front private area" on a demonstrative drawing when asked where his body made contact with hers.

David Dodson testified that he and H.B.'s father, John Bush, were sitting on the front porch that afternoon drinking beer. Accompanied by his large pit bull, David went into the house to get some tools from his upstairs room. David explained that "[w]hen [the dog] run[s] through the house, you hear it shaking." "Soon as I came up the stairs," David said, "Jupe came running out the back room" and went

"[r]ight to the bathroom." Recalling the rule against being in other people's rooms, David asked appellant "what he was doing back there." Appellant responded that he had been "playing with" H.B. David told H.B.'s father what he had seen and what appellant had said.

David denied that he told detectives that appellant had said he was "messing with" H.B. rather than "playing with" her, but also testified that he did not see any difference between the two terms. Mr. Bush testified that David told him Jupe had been "in [Mr. Bush's] room messing with [H.B.]."

After talking with David, Mr. Bush went upstairs and asked H.B. "why was Uncle Jupe in the room?" He told H.B. she was not in trouble, but she at first just stared at him and acted like "she ain't want to say nothing, but you know she was — something she wanted to say." She looked a "little bit" scared, and was "fidgeting with her fingers." Mr. Bush asked again, and H.B. said that Uncle Jupe was "on top of me and wouldn't let me up."

On cross-examination defense counsel pressed Mr. Bush about the phrasing of his questions to his daughter. Mr. Bush denied that he had asked "how Jupe had messed with her. . . . I never asked her where Jupe touched her. I asked her why

Jupe was in the room." Mr. Bush denied that he raised his voice when talking with H.B., but agreed that he had to ask her a second time and that she "had a look on her face like she thought she was going to get in trouble." Mr. Bush acknowledged that in July of 2015 he would yell at H.B. when she did "something wrong," but denied counsel's assertion that "[t]he main way that you interact with your daughter is through screaming [or] yelling."

Mr. Bush testified that he "was not mad" when he began questioning H.B. because he "didn't have a reason to be mad at that time, at first." However, when H.B. told him what had happened, Mr. Bush was "[b]eyond upset" and told Mr. Dodson he "was going to fuck him up." Mr. Dodson "went out the back door and [Mr. Bush] went out the back door behind him chasing him out the back door." Mr. Dodson was saying, "let's talk, let's talk," but Mr. Bush would not listen because his "daughter [was] not going to tell me something that's a lie."

H.B. left the house with her mother. H.B. testified that they saw Mr. Dodson down the street, and that he told H.B. to "tell your mom what had happened." The mother did not testify.

Both appellant Dodson and someone else called 911, and two detectives

arrived on the scene and interviewed H.B. The following day, H.B. participated in a forensic interview at the Child Advocacy Center during which she said that Mr. Dodson "pushed her down onto a bed" and "humped her privates."

Appellant called Dr. Bradley McAuliff, a professor of psychology who testified as an expert on "child suggestibility and interviewing." According to Dr. McAuliff, the types of questions an adult asks can "dramatically influence" a child's relaying of information.[1] Dr. McAuliff also explained "source authority," which is the concept that a child may tell an adult incorrect or untruthful information primarily because a child is predisposed to "defer" to the perceived authority of that adult. In response to a hypothetical question about a father with a history of physical violence toward a child, Dr. McAuliff testified that "the history of physical violence increases [the father's] authority in a way that relates to the child just being scared of that individual and being more willing to acquiesce or go along with or agree with information there. . . . That can enhance the child's suggestibility . . . ." Dr. McAuliff had not interviewed H.B. or any of the other witnesses in this case.

---

[1] For example, he stated that "suggesting touch or asking directly about touch can influence a child's report" depending on the child's age. Additionally, repeated questions from the same or different adults can cause a child to shift their answers because they interpret the repetition to "signal" that they have given an incorrect response. Over time, children may "encode" the changed answer into their memory.

## B. The Defense Theory

The defense theory was that nine-year-old H.B.'s testimony was not credible. In his opening statement, appellant's counsel asserted that H.B.'s father "went into the room where [H.B.] was, slammed the door behind him and confronted her. And he was angry. And you will hear that she was scared. He began confronting her, questioning her. And when he asked her whether my client, her uncle, had touched her, she acquiesced and said yes."

Counsel also asserted that H.B.'s "story as to what happened has changed over time. And it's changed because it's not her story. . . . [S]he's saying these things because she thinks it's what her father and the other adults in this case want to hear." The jurors should not be persuaded, he said, because the government's case depended on the testimony of "a nine-year old child who was confronted by her angry father and who was scared; a nine-year old who had words put into her mouth; a nine-year old whose story changes upon every retelling."

In his closing argument, appellant's counsel emphasized the themes of fear

and suggestibility.[2]  "This case started when [H.B.'s father] came into that bedroom, when [he] asked [H.B.] how did Uncle Jupe mess with you?  Where did Uncle Jupe touch you?  This case started when [H.B.] acquiesced and told her father consciously or subconsciously what she thought he wanted to hear, and it snowballed from that bedroom right into this courtroom."

Counsel reminded the jurors that H.B.'s father has a temper.  In the past he had "hit her in the face, hit her in the chest, hit her with a belt, hit her pregnant mom in the belly in front of her."  H.B. "told us that that day, she didn't want her dad to be mad at her."  Moreover, the defense expert, Dr. McAuliff, "told us . . . that that was a recipe for disaster, a recipe for suggestibility. . . .  [T]hat history of violence, that fear she had of [her father] would only increase that phenomenon, only increase the likelihood of suggestibility."  Furthermore, "the fact that [H.B.] has given different versions over time, that alone is a reason to doubt."

---

[2] The defense presented testimony from Jacqueline Simpkins, a social worker who had observed a forensic interview of H.B. conducted in 2012.  Although that interview was not related to any allegation of sexual abuse, the interviewer asked H.B. routine questions about whether anyone had touched her nipples, "her privates," or her butt.  H.B. answered "no" to all of those questions.  In closing argument, defense counsel emphasized H.B.'s "prior exposure to sexualized content, whether on TV or that prior interview by the social worker."

Finally, the court reminded the jurors in its instructions that "[i]t is the defense theory that Thomas Dodson did not sexually abuse [H.B.]. The defense maintains that [H.B.'s] allegation is the result of . . . suggestive . . . and repeated questioning by her father and others combined with her fear of her father, her prior exposure to sexualized content, and other factors suggesting to suggestibility [sic] that led to her false report."

## II. Discussion

### A. Additional Background

On cross-examination, H.B. confirmed that her father was angry when he came in the room, but she denied that she was "scared of him." However, answering "yes" to a series of leading questions, she agreed that her father "has a temper" and that he had hit her in the past; he had hit her "in the eye," "in the chest," and "with a belt." She had seen her father hit her mother when she was pregnant with H.B.'s baby sister.

H.B. acknowledged once more that her father "has that temper" and admitted that she didn't want him to be angry with her. After her father left the room, "there was a lot of shouting in [the] house" and "everyone just started arguing." H.B.

agreed that her father wanted to know "where Uncle Jupe had touched" her and "how Uncle Jupe had messed with" her, including whether Uncle Jupe had gotten "into the bed" and "gotten on top of" her. H.B. also acknowledged that she had described the events differently to different people. For example, she told a detective that appellant had "pushed [her] to the ground and felt [her] privates over [her] clothing," while she told her mother that "he's been pulling on me and trying to feel on me." H.B. agreed that being pushed to the ground is different than being pushed onto a bed and that both those things cannot be true. Appellant does not assert that the court impermissibly curtailed cross-examination of H.B.

After an intervening exchange about what she had said to various people, the prosecutor asked, "When was the very last time that your dad hit you?" H.B. said she did not know, but it had not happened since she started school that year. On July 6, when H.B. told her father what had happened, he did not hit her or say that he was going to hit her.

To suggest that H.B. really *was* (or should have been) afraid of her father's violence, appellant's counsel sought to cross-examine Mr. Bush about his prior physical abuse and to admit evidence of a 2012 investigation into that abuse by the Child and Family Services Agency ("CFSA"). Counsel proffered that, during that

investigation a family safety plan had been put into place to prevent Mr. Bush from "be[ing] alone with [his] daughters because of how much [he] intimidated them." Counsel wanted to cast doubt upon Mr. Bush's testimony on direct examination that his interactions with H.B. that day were "very gentle" (these were defense counsel's words, not Mr. Bush's) by "confront[ing]" him with evidence that he did not "ordinarily interact[]" with H.B. in a calm or gentle manner.[3]

When the trial court asked how the 2012 investigation would be relevant to the day in 2015 when Mr. Bush questioned H.B., appellant's counsel said it would "corroborate" H.B.'s testimony about her father's anger on the day of the incident and would head off any argument that her testimony during cross-examination was "lead-able or suggestible."

After determining that the government would not contest H.B.'s testimony that her father had hit her, and had hit her mother in her presence, the trial court noted that those "specific acts . . . are in for the purpose of showing how [H.B.]

---

[3] Counsel had proffered earlier that appellant Dodson had witnessed ongoing abuse in the household since the 2012 CFSA investigation. Counsel acknowledged, however, that if the witness "denies it, I probably won't put [appellant] up to try to impeach that."

perceived this man that you said was trying to convince her to make these accusations." The court allowed cross-examination about Mr. Bush's "tone of voice and yelling . . . only on [July 6, 2015], not prior." After Mr. Dodson objected that he had a right under the Fifth and Sixth Amendments to "confront" Mr. Bush and "expose the true nature of the relationship he has with his daughter," the trial court responded: "to the extent you think that's relevant, it's already in and as is its effect on her."

During an extended discussion with both counsel, the court commented that, "if the safety plan is still in place, . . . it may be relevant that . . . CFSA believes him to be an intimidating force and that he's not even supposed to be alone with her. But I don't know whether that's in the records." Seeming to address both counsel, the court stated, "[Y]ou need to tell me, as best you can from the records, what you know about the state of the safety plan."

On the following day, after discussions with CFSA personnel, appellant's counsel reported, "I have no reason to think that there's any family safety plan relating to John Bush in effect as of the date of this offense and, indeed, since a date in 2012." The court and the parties soon turned their attention to possible testimony by other social workers.

As summarized in note 2, *supra*, appellant presented the testimony of social worker Jacqueline Simpkins. Appellant also wanted to call LaShawn Dunn, a social worker with a private organization who had worked in collaboration with CFSA during the 2012 investigation. Counsel wanted her to testify about interactions she had seen between Mr. Bush and his children. According to counsel's proffer, Ms. Dunn had more than twenty years of experience working with children and over the course of ten months she observed Mr. Bush "always yelling" at the children for "[a]nything," such as "dropping paper on the ground." "He did not have a gentle setting." She would have testified that Mr. Bush's daughters had "fear in their eyes" and "jumped whenever their father said anything to them." Counsel argued that such testimony would rebut Mr. Bush's claim that he had (in counsel's words) "a benign, appropriate interaction" with his daughter on July 6. The court disagreed: "[Y]ou may ask him whether he yelled at her, whether that's his way of dealing with her, you may ask him that. And then whatever he says, he says[.]" But "without any information about what happened in the intervening period," the court did not think "this information about yelling at the child in 2012 . . . would go to rebut whatever he says."

**B. Legal Analysis**

Appellant argues that his constitutional rights to confront his accuser and to present a defense were violated when the trial court precluded him from presenting additional testimony and conducting further cross-examination of Mr. Bush about his aggression toward H.B. Appellant asserts that these rulings impermissibly hindered his efforts to reveal the nature and extent of H.B.'s motivation when reporting the abuse and when testifying at trial. We disagree.

There is no doubt that "'the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986) (quoting *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974)). Motivation can be a form of bias. *See McCloud v. United States*, 781 A.2d 744, 752 (D.C. 2001) ("Bias refers both to a witness's personal bias for or against a party and to his or her motive to lie."). Moreover, "[i]t is not enough that the possibility of bias be mentioned; counsel must be permitted to present the nature and extent of the bias," *Longus v. United States*, 52 A.3d 836, 851 (D.C. 2012), whether through cross-examination or by presenting extrinsic evidence, *see McDonald v. United States*, 904 A.2d 377, 380 (D.C. 2006); *Hollingsworth v. United States*, 531 A.2d 973, 979 (D.C. 1987).

But "[it] does not follow . . . that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness." *Van Arsdall*, 475 U.S. at 679. The Constitution "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). "[T]rial judges retain wide latitude to . . . impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679.

"[D]efendants must be afforded 'some opportunity' — a fair and meaningful opportunity — to show that the government's witnesses are biased." *McDonald*, 904 A.2d at 380. This "meaningful opportunity" standard applies both to cross-examination and to the presentation of extrinsic evidence. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense") (internal quotation marks omitted); *McDonald*, 904 A.2d at 380.

Our rulings on questions like this must of necessity be based on such general principles and the record of the individual case. Nevertheless, we are guided by the Supreme Court's holding that "a violation of the Sixth Amendment is shown if '[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense] counsel been permitted to pursue [the] proposed line of cross-examination.'" *In re J.W.*, 258 A.3d 195, 202 (D.C. 2021) (quoting *Van Arsdall*, 475 U.S. at 680). Applying these standards, we conclude that appellant's constitutional rights were not violated.

Bear in mind that John Bush did not have any first-hand knowledge about what occurred when appellant was in the bedroom with H.B. She was the percipient witness. There was no evidence that H.B. harbored ill will against appellant, and appellant does not assert that the trial court impermissibly curtailed his cross-examination of her. Rather, as detailed above, he tried to attack her credibility by focusing on her father — asserting that she falsely accused appellant because she feared her father and (consciously or sub-consciously) told him what she thought he wanted to hear. These intertwined theories of fear and suggestibility were amply supported by the cross-examination of H.B. and the testimony of Dr. McAuliff, and

they were vigorously argued by defense counsel.[4]

Importantly, the court did not restrict inquiry (of either H.B. or her father) concerning whether John Bush's questions were phrased in a suggestive manner. In addition, social worker Jacqueline Simpkins testified about a previous interview of H.B. which touched upon sexual topics, and H.B. acknowledged that the TV show Criminal Minds sometimes addressed "bad sexual stuff . . . like rape." And the defense expert, Professor McAuliff, thoroughly explained the various factors that can engender suggestibility in child witnesses. Thus, appellant's argument rests on his claim that he should have been provided more opportunities to assert that H.B. feared her father on July 6 and that this fear somehow led her to falsely accuse appellant of sex abuse.

When asserting that he should be allowed to cross-examine Mr. Bush about his prior bad acts, and to present extrinsic evidence of them, in order to impeach Bush's testimony about how he interacted with H.B. on July 6, appellant's counsel

---

[4] The dissent chastises us for referring to the "intertwined" theories of fear and suggestibility, but this is an accurate description of the record. As described above, defense counsel repeatedly combined these theories in his questioning of Dr. McAuliff and in his arguments to the court and to the jury.

warmly embraced a propensity argument. See 12/15/15 Tr. 164 ("The fact that he has struck her in the past is absolutely relevant to what he did that day because propensity is super relevant."). However, the trial court properly recognized that counsel would be using that evidence in "exactly the way you're not supposed to use it." "Although a witness may be impeached by inquiries into prior bad acts relevant to credibility, '[g]enerally speaking, a party cannot present evidence that a person acted in a certain fashion on a prior occasion in order to show conformity with that behavior in a later setting.'" *Austin v. United States*, 64 A.3d 413, 422 (D.C. 2013) (quoting *Brown v. United States*, 726 A.2d 149, 153 (D.C. 1999)). Moreover, when offered to impeach a witness's credibility, "[p]rior bad acts not rising to the level of a criminal conviction . . . cannot be proven by extrinsic evidence." *Brown*, 726 A.2d at 153.

Appellant has now revised his argument to assert that "the impeachment value of Mr. Bush's prior yelling and abuse did not depend on an improper propensity inference." He claims that "[e]vidence of Mr. Bush's past anger and hostility toward H.B. was relevant to show his motive to treat her with similar anger and hostility at a later time[.]" This reformulation (focusing on Mr. Bush's "motive" and his behavior "at a later time") is nothing more than an assertion that on July 6 Mr. Bush likely would have acted in conformity with his past behavior — in other words, a

propensity argument.[5]

Appellant apparently hoped to present evidence about the 2012 safety plan through an unnamed CFSA social worker. Because of confidentiality rules, appellant proffered few details about the plan, and discussion of that evidence ended soon after appellant's counsel reported that he had no reason to think that the plan was in place after 2012. It appears from context, however, that the trial court thought that, due to the gap in time, such evidence would not appropriately rebut Mr. Bush's testimony about his interaction with H.B. on July 6, 2015.

Appellant gave a more complete proffer of the testimony he hoped to elicit from social worker LaShawn Dunn, but her observations likewise had ended in 2012. The court excluded her testimony about Mr. Bush's behavior because, "without any information about what happened in the intervening period," it would not "go to

---

[5] The dissent attempts to reformulate the argument yet again by focusing on H.B.'s motive instead of Mr. Bush's motive, asserting that "a history of an abusive relationship with her father may have motivated H.B. to give her father an answer that would keep him from getting angry *at her*, even if it meant fabricating allegations against Mr. Dodson." *Post* at 29. The defense made that point repeatedly, through evidence and in argument. At this point in the trial, defense counsel was trying to demonstrate that Mr. Bush must have been more fearsome on July 6 than either he or his daughter acknowledged.

rebut whatever he says." "[T]his information about yelling at the child in 2012, I just don't think that's appropriate, and I'm not going to allow it."

It is important to recognize that the trial court did not preclude all inquiry into the topics of assault, yelling, and fear. *See In re D.E.*, 991 A.2d 1205, 1211 (D.C. 2010) ("[W]here ample cross-examination has already been allowed or evidence admitted on a particular issue, trial court curtailment of the defendant's presentation does not implicate the defendant's Sixth Amendment rights[.]"). Indeed, after extensive discussion, and voir dire of the witness, the court allowed defense counsel to question H.B. about her father's prior acts of violence. See 12/15/15 Tr. 105 (court stating that "the defendant has a right to show that the child is suggestible and subject to the influence of the father and I guess things that go to that are relevant"). As detailed above, H.B. then acknowledged, and the government did not contest, that her father had hit her and that she had seen him hit her pregnant mother. (Contrary to the dissent's suggestion, the government never asserted (or even implied) that these acts of violence did not occur.)[6] Despite counsel's persistence,

---

[6] Our dissenting colleague misconstrues the government's rebuttal argument. The prosecutor was not arguing that the jury should discredit H.B.'s testimony about Mr. Bush's physical abuse of her and her mother, nor would the jury have inferred that the prosecutor was doing so. There were multiple topics on which defense counsel asked a series of leading questions and elicited a series of "yes, yes, yes"

at no time did H.B. recant her accusations or suggest that she had been intimidated into testifying falsely.

As demonstrated above, appellant developed a substantial record that permitted him to argue his theories of fear and suggestibility to the jury. *See Howard v. United States*, 241 A.3d 554, 564 (D.C. 2020) ("[I]t is significant here that during [appellant's] closing argument, his counsel was able to make the very argument to the jury that he now claims the trial court precluded him from eliciting on cross-examination."); *Gardner v. United States*, 698 A.2d 990, 998 (D.C. 1997) (the "facts were sufficient to enable defense counsel to argue [his theory] to the jury"; concluding that "the questioning permitted . . . satisfied Confrontation Clause requirements"). The vexing problem for appellant is that the jury was well aware of the evidence and counsel's arguments, but chose to believe H.B.'s testimony.

---

answers. Read in context, the passage quoted by the dissent (which focused on the topic of "suggestive, leading questions") was responding to defense counsel's argument mocking Mr. Bush's characterization of his interaction with H.B. after he entered the bedroom on July 6: that "somehow he asked non-leading questions in a non-leading fashion about what he really thought was a nonissue."

### III. Conclusion

In sum, appellant had a "meaningful opportunity" to cross-examine the government's witnesses and to present extrinsic evidence bearing on their credibility. The limitations of which appellant complains were reasonable and within the "wide latitude" retained by trial judges. Appellant has not carried his burden of showing that a reasonable jury "might have received a significantly different impression of [H.B.s] credibility had [defense] counsel been permitted to pursue [the] proposed line of cross-examination." *In re J.W.*, 258 A.3d at 202. Appellant's convictions are hereby.

*Affirmed.*

BECKWITH, *Associate Judge*, dissenting: Two questions—and what their answers could say about H.B.'s motive to falsely accuse Thomas Dodson—were the focus of the parties' energies in this trial. Was H.B. afraid of her father? And how real was that fear? The defense elicited and highlighted H.B.'s testimony that her abusive father was angry when he confronted her and that he asked her where Uncle Jupe had touched her, how he had messed with her, and whether he had gotten on top of her. The prosecutor cast doubt on that testimony as the product of leading

questions on cross-examination, stating in closing argument that H.B. "just agreed with everything [defense counsel] said really, yes, yes, yes, yes, yes, yes." The government instead endorsed John Bush's own testimony that he was *not* angry when he approached his daughter and that he only got angry after she told him that Mr. Dodson had assaulted her.

It was in this context that the defense sought to fill in the picture of the father-daughter relationship through cross-examination of Mr. Bush and testimony from a social worker named LaShawn Dunn. Ms. Dunn would say that three years earlier, the Child and Family Services Agency (CFSA) had put a family safety plan in place to prevent John Bush from "be[ing] alone with [his] daughters because of how much [he] intimidated them." Ms. Dunn, who was involved for ten months in the CFSA investigation that led to the safety plan, would tell the jury that Mr. Bush was "always yelling" at his daughters for "[a]nything"—such as "dropping paper on the ground." She would testify that the girls "jumped whenever their father said anything to them." She would say that they had "fear in their eyes."

No one seriously disputes the relevance of this evidence. And the majority does not tell us what other valid discretionary basis justified excluding this

evidence—that it was repetitious, for example, or that it confused the issues at trial. There was none. Instead, in affirming the trial court's denial of Mr. Dodson's request to present this evidence, the majority essentially holds that Mr. Dodson's defense was good enough—he didn't have a Fifth and Sixth Amendment right to make it more compelling to the jury. But in fact Mr. Dodson did have a well-established constitutional right to present probative evidence that would give the jury a far more vivid picture of the basis for H.B.'s fear of her father—and thus her motive to falsely accuse Mr. Dodson when her father confronted her—than the evidence that my colleagues in the majority believe "amply supported" his bias theory. In the majority's view, the jury got the gist of the defense's theory of H.B.'s bias from evidence that Mr. Bush had hit H.B. in the past (which the government, though not disputing, set out to downplay) or evidence that Mr. Bush was angry when he entered the room (which the government rebutted with testimony to the contrary and then ardently disputed in closing).

Setting aside for the moment whether it's accurate to characterize H.B.'s responses on cross-examination—testimony shrugged off by the government in closing—as "amply supporting" Mr. Dodson's fear-based bias theory, the Confrontation Clause entitles a defendant to present more than just "ample"

evidence that a witness was motivated to falsely accuse him. A trial court generally cannot preclude relevant evidence of bias. *See Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) (stating that a trial court violates a defendant's Confrontation Clause right by prohibiting him "from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness'" (alteration in original) (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974))). Trial courts undoubtedly have discretion to "limit cross-examination to preclude repetitive and unduly harassing interrogations . . . or to prevent inquiry into matters having little relevance or probative value to the issues raised at trial." *Brown v. United States*, 952 A.2d 942, 947 (D.C. 2008) (alteration in original) (quoting *Adams v. United States*, 883 A.2d 76, 81 (D.C. 2005)); *see also Van Arsdall*, 475 U.S. at 679 (identifying "harassment, prejudice, confusion of the issues, the witness'[s] safety," repetition, and "marginal[] relevan[ce]" as concerns that may justify reasonable limits on cross-examination designed to show a witness's bias). But "the exercise of such discretion 'cannot justify a curtailment which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony.'" *Coates v. United States*, 113 A.3d 564, 573 (D.C. 2015) (quoting *Bennett v. United States*, 797 A.2d 1251, 1257 (D.C.

2002)); *see also Longus v. United States*, 52 A.3d 836, 853 (D.C. 2012) (stating that a trial court's discretion on evidentiary matters cannot go so far as to prevent "otherwise legitimate questioning by defense counsel to probe a witness's bias").

It is beyond serious question that the evidence the trial court excluded amounted to "relevant and important facts bearing on the trustworthiness of crucial testimony." *Coates*, 113 A.3d at 573 (quoting *Bennett*, 797 A.2d at 1257). The trial court acknowledged the relevance of the evidence—because, as it noted, an interaction with someone can be "influenced by . . . prior interactions" with that person, such as abuse or intimidation—but said it had "already [come] in" through H.B.'s testimony. Indeed, the prosecutor's effort to minimize H.B.'s testimony on cross-examination as the mere product of leading questions proves how significant the excluded evidence was to Mr. Dodson's defense.[1]

---

[1] *Cf. Andrews v. United States*, 922 A.2d 449, 460 (D.C. 2007) ("A prosecutor's repeated highlighting [of particular evidence] . . . is persuasive evidence of its centrality . . . ."); *Allen v. United States*, 837 A.2d 917, 922-23, 922 n.1 (D.C. 2003) (noting that the prosecutor's closing argument "demonstrat[ed] . . . the centrality of [the trial court's] error" in overruling the defendant's objection to cross-examination); *Green v. United States*, 231 A.3d 398, 414 (D.C. 2020) ("A prosecutor's stress upon the centrality of particular evidence in closing argument tells a good deal about whether the admission of the evidence was . . . prejudicial." (alteration in original) (quoting *Morten v. United States*, 856 A.2d 595, 602 (D.C. 2004))); *Hill v. United States*, 858 A.2d 435, 448 (D.C. 2004) (finding that the

The majority does not expressly hold that the proffered evidence here was excludable on one of the grounds that might permit a court, in the exercise of its discretion, to properly exclude it as evidence of bias, *see Van Arsdall*, 475 U.S. at 679, and the evidence displayed none of those flaws. The fact that the CFSA investigation had occurred three years before trial was not a valid basis for excluding important bias evidence. At the outset, defense counsel proffered that Mr. Dodson, who lived in the house with this family, could confirm that the abuse had continued beyond 2012. "[W]here counsel has information from her own client, which she does not know to be false and which is not 'inherently incredible,' she has a sufficient good-faith basis for the proposed cross-examination." *Scull v. United States*, 564 A.2d 1161, 1164 (D.C. 1989).

And in any event, it is well settled that incidents that occurred in the past can be probative of a witness's relationships in ways that may affect her testimony. *See, e.g.*, *Obiazor v. United States*, 964 A.2d 147, 150-52 (D.C. 2009) (finding that the

---

erroneous admission of an unwarned statement was not harmless because it was "a focal point of the prosecution" as shown in part by the fact that it "was showcased in the government's closing argument"); *Cotton v. United States*, 388 A.2d 865, 872 (D.C. 1978) (finding any error harmless in part because the prosecutor "made no mention of [the challenged evidence] in his closing argument to the jury").

trial court erred in precluding cross-examination about a child accuser's prior sexual incidents and accusations, including one seven years prior, and rejecting the argument that a prior incident introduced to show witness bias "must have happened within a limited time frame, or that there must have been intervening incidents to establish a nexus between the prior incident and the current one"); *United States v. Robinson*, 530 F.2d 1076, 1079-80 (D.C. Cir. 1976) ("[T]he trier must be sufficiently informed of the underlying relationships, circumstances and influences operating on the witness so that, in light of his experience, he can determine whether a mutation in testimony could reasonably be expected as a probable human reaction. Courts are therefore very liberal in accepting testimony relevant to a showing of bias." (quoting 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* § 607(03) (1975))); *Wynn v. United States*, 397 F.2d 621, 623-24 (D.C. Cir. 1967) ("A previous quarrel between the witness and the party testified against readily suggests the possibility of residual hostility, and the admissibility of extrinsic testimony to establish the event seems unquestioned." (footnote omitted)); *Stack v. United States*, 519 A.2d 147, 153-54 (D.C. 1986) (finding that the trial court erred in excluding evidence of prior assaults "unless linked to 'the relevant time period'" because such evidence "was clearly admissible to show bias and motive to fabricate" and case law

supported the idea that even prior incidents "many years ago" are not "so remote in time to be irrelevant to the parties' relationship").

The majority also indicates—though again, to what end is not clear—that it would have been improper for Mr. Dodson to rely on the proposed testimony and cross-examination to draw a propensity inference. That is true as far as it goes.[2] "But there is no rule of evidence which provides that testimony admissible for one purpose and inadmissible for another purpose is thereby rendered inadmissible; quite the contrary is the case." *United States v. Abel*, 469 U.S. 45, 56 (1984). Here, the precluded testimony and questions had a valid purpose that was not about showing Mr. Bush's character or temperament: to show H.B.'s bias. That is, a history of an abusive relationship with her father may have motivated H.B. to give her father an answer that would keep him from getting angry *at her*, even if it meant fabricating allegations against Mr. Dodson. The majority does not dispute that this was a proper purpose that Mr. Dodson put forth both in the trial court and in his argument on appeal. Nor does the majority actually say there was a risk of the jury using this evidence for an improper purpose, but to the extent there was such a risk, a well-

---

[2] Thus Mr. Dodson could not use this evidence for the purpose of showing that Mr. Bush acted in accordance with how he had interacted with H.B. in the past.

crafted jury instruction could have addressed that concern. *Cf. Green v. United States*, 440 A.2d 1005, 1008 (D.C. 1982) (discussing the use of limiting instructions where a defendant's own prior bad act is admitted for impeachment purposes).

That leaves the majority's suggestion—stemming perhaps from a concern about "repetition," though again the majority does not frame it as such—that Mr. Dodson had a meaningful opportunity to pursue this bias theory because there was enough evidence to permit him to make this argument. And yet the majority avoids any statement that the fear-based theory *alone* had sufficient support in the record to satisfy the Confrontation Clause. Instead, the majority combines Mr. Dodson's theory that H.B.'s fear of her father motivated her to lie with his contention that H.B. was suggestible, stating that "*[t]hese intertwined theories of fear and suggestibility were amply supported by cross-examination of H.B. and the testimony of Dr. McAuliff.*" *Ante* at 16 (emphasis added). However related the two bases for impeachment were—and the majority uses the phrase "fear and suggestibility" three times—they were not "intertwined" for Confrontation Clause purposes. "[T]he allowance of some examination for one type of bias . . . does not satisfy the Sixth Amendment with respect to cross-examination for . . . a different kind of bias." *Longus*, 52 A.3d at 852; *cf. Coates*, 113 A.3d at 574 (finding that the trial court's

exclusion of evidence going to a witness's corruption bias was error notwithstanding the introduction of other similar impeachment evidence—including evidence that permitted the defendant to "attempt to make a corruption bias argument"—because none of the other impeachment evidence "directly showed" corruption or "made a serious dent in the government's argument"). Dr. McAuliff's testimony regarding suggestibility provided a ground for impeaching H.B. that was distinct from the fear theory. It could not logically meet the force of the government's efforts to convince the jury that Mr. Bush was not angry when he started questioning H.B. and so H.B. had no reason to falsely accuse Mr. Dodson out of fear of her father's anger. Given Dr. McAuliff's testimony that a child's fear would "only increase the likelihood of suggestibility," the separate suggestibility theory may itself have been hindered by the court's exclusion of the additional evidence of H.B.'s fear. But Dr. McAuliff's testimony in no way compensated for the exclusion of evidence demonstrating how real that fear was.

In turn, the blanket exclusion of this evidence was not harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967). With Mr. Dodson's proposed evidence excluded, the only evidentiary support for his fear-based bias theory—and the only evidence of Mr. Bush's abuse of H.B.—came from

H.B.'s own testimony on cross-examination. And the prosecutor was able to explicitly undermine this evidence by describing H.B. as an uncorroborated source whose testimony was likely manipulated by the defense on cross-examination. The prosecutor referred, for example, to "[t]he one time [H.B.] was asked suggestive, leading questions," asking the jury:

> When was that one time? Cross-examination. Cross-examination. That was the time she was asked a lot of questions in a row and he had an answer that he wanted her to give. And that's how cross-examination works. He has an answer that he wants to get out of her . . . . That's what he's trying to do. And that's what [H.B.] said, you know, just agreed with everything he said really, yes, yes, yes, yes, yes, yes.

The government's determination to capitalize upon the lack of an unbiased source substantiating H.B.'s responses on cross-examination makes plain why the precluded evidence and cross-examination were not only relevant but critical to the viability of the defense theory. *See United States v. DeLoach*, 504 F.2d 185, 191-92 (D.C. Cir. 1974) (finding that improper restrictions on defendant's closing argument were not harmless because "had [they] really been unimportant," the prosecution would not "have devoted much of [its closing argument]" to rebutting the defense theory it had sought to limit). Ms. Dunn's corroborative testimony would have markedly countered the government's arguments to the jury that H.B.'s admissions

of her father's prior abuse were only on cross-examination and were exactly what defense counsel wanted her to say.

This is also not a case where the evidence of guilt was overwhelming, and the majority does not contend otherwise. Indeed, certain atmospheric exculpatory evidence indicated that this was not a strong case for the government. For example, the alleged sexual abuse took place in the middle of the afternoon when H.B.'s mother and father and other family members were at home. When Mr. Bush confronted Mr. Dodson and chased him out of the house, Mr. Dodson tried to get Mr. Bush to talk and then called 911 himself. And Mr. Dodson told H.B. to "tell [her] mom what had happened" when he encountered H.B. outside on the street with her mother (who never testified). These facts aligned with Mr. Dodson's insistence that he did not abuse H.B. in the family's house that day.

In sum, the case against Mr. Dodson turned largely on the credibility of H.B.'s account of what happened. The government's own closing argument—which emphasized that Mr. Bush was not angry and portrayed the parts of H.B.'s testimony that could suggest she reacted out of fear of her father as a "one-time" parroting of defense counsel's leading questions—confirms the significance of the precluded

questioning and evidence. It illustrates that even the government thought that the jury would have had "a significantly different impression of [H.B.'s] credibility" had there been evidence that could flesh out her testimony about her father's abuse to show in very real terms why that abuse might have triggered a fear-based response. *In re J.W.*, 258 A.3d 195, 205 (D.C. 2021). On this record, there is more than a "reasonable possibility" that the unconstitutional exclusion of Ms. Dunn's testimony and the cross-examination of Mr. Bush affected the jury's verdict. *Chapman*, 386 U.S. at 23. I respectfully dissent.